UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

KIMBERLY REGENESIS, LLC,
and DAMASCUS TRADING
COMPANY, LLC,

     Plaintiffs,

v.                            Case No.:  2:19-cv-538-SPC-NPM

LEE COUNTY,

     Defendant.

_____

## COURT'S FINDINGS OF FACT AND CONCLUSIONS OF LAW

### Introduction

The question here is whether Defendant Lee County ("Board" or "County") discriminated against or failed to accommodate Plaintiffs Kimberly Regenesis, LLC ("KR") and Damascus Trading Company, LLC ("DTC") (jointly, "Plaintiffs") because of their disability under the ADA.  This is not a case in which the court decides land-use or zoning.  *See Spence v. Zimmerman*, 873 F.2d 256, 262 (11th Cir. 1989) ("Federal courts do not sit as zoning boards of review.") (cleaned up).  The Court must determine whether Plaintiffs have established by a preponderance of the evidence that the Board

violated the ADA.[1]

In a bench trial, the judge serves as the fact-finder. In this capacity, the judge's function includes weighing the evidence, evaluating the credibility of witnesses, and deciding questions of fact, as well as issues of law. *See Childrey v. Bennett*, 997 F.2d 830, 834 (11th Cir. 1993) (holding that "it is the exclusive province of the judge in non-jury trials to assess the credibility of witnesses and to assign weight to their testimony"). A plaintiff in a civil case bears the burden of satisfying the finder-of-fact that he has proven every element of his claim by a preponderance of the evidence. *Johnson v. Florida*, 348 F.3d 1334, 1347 (11th Cir. 2003). "The burden of showing something by a preponderance of the evidence . . . requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence before he may find in favor of the party who has the burden to persuade the judge of the fact's existence." *Concrete Pipe & Prod. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 622 (1993) (quotation marks and alteration omitted).

The Court heard testimony and argument during a five-day bench trial.

---

[1] These are narrow questions. But the parties presented evidence at trial on various legal issues, many of which the Court already decided. For instance, the Court heard evidence related to standing, res judicata, and collateral estoppel, all of which the Court ruled on in its summary judgment order. (Doc. 183). Given these circumstances, some findings of fact may appear untethered from the discrete ADA claims. That said, the Court makes the following factual findings to create as complete a record as possible.

(Docs. 209–11, 219–20). The parties have since provided their proposed Findings of Fact and Conclusions of Law ("FFCL"). (Docs. 223, 224). Having reviewed the parties' filings and considered the evidence, the Court reaches these findings of fact and conclusions of law under Federal Rule of Civil Procedure 52(a).

## Jurisdiction and Venue[2]

Subject matter jurisdiction is proper pursuant to 28 U.S.C. § 1331. The parties do not contest personal jurisdiction or venue.

## FINDINGS OF FACT[3]

### The Parties

1.    The Board of County Commissioners for Lee County, Florida ("Board" or "County") is a political subdivision of Florida and the county's governing body.

2.    On August 5, 2015, the Board denied Plaintiffs' application to rezone 6401 Winkler Road ("Winkler Property"). (Doc. 66-5; PTS ¶¶ 1, 13; Tr. 369:19–21).

---

[2] The County argues that Plaintiffs lack standing. The Court addresses this argument later in its Conclusions of Law.

[3] The Court's citations mirror the parties' citation conventions in their proposed FFCL as follows. The Court cites the trial transcript by using the abbreviation "Tr." and a pinpoint citation to the page and line of the original transcript (not the page number that appears in the header generated by CM/ECF). Joint Exhibits are "JX." Defendant's exhibits are "DX." Plaintiffs' exhibits are "PX." The stipulated facts agreed upon in the Joint Final Pretrial Statement (Doc. 198) are "PTS."

3.     The Winkler Property is part of an unrecorded subdivision known as "Cold Saturday Farms," which consists of eight lots, each about five acres in size, all currently zoned Agricultural (AG-2). (Tr. 504:14–15; JX82).  The Winkler Property is 5.15 acres.  (Tr. 44:11–14).

4.     Lee County staff, the county attorney, and the county attorney's staff lack the authority to rezone property or allow a prohibited use on a property.  (Tr. 155:13–156:11, 164:14–16, 165:20–166:3; DX1).  Only the Board has the authority to rezone a parcel to allow a prohibited use or to modify a zoning ordinance. (Tr. 155:13–156:11, 164:14–16).  Such actions can be taken only through the rezoning process, special magistrate process, or amendment of the land development code.  (Tr. 164:17–19, 20–25, 165:6–25; DX1).

5.     In a planned development rezoning application or a request to allow a prohibited use on a parcel, the Board is the sole entity that interprets the Lee Plan, the County's comprehensive zoning plan.  (Tr. 36:9–11, 606:21–607:14, 608:12–20).

6.     KR is a for-profit company.  KR is not disabled.  (Tr. 309:13–17).

7.     DTC is a for-profit company.  DTC is not disabled.  DTC has never provided or offered substance abuse treatment services.  (Tr. 416:23–417:5).  It has not been certified or licensed to operate a recovery residence or provide substance abuse treatment.  (Tr. 425:18–426:1). DTC has never

4

contracted with, taken in, or provided services to any patient or resident.
(PTS ¶ 20).

8.    On April 27, 2012, Kevin A. Kyle organized and formed DTC.
(Tr. 420:10–12, 421:22–24; JX15; DX186).    At the time of the rezoning
application, Kyle was DTC's sole member.  (Tr. 420:13–15, 425:15–17; JX15;
DX186).  According to Thomas Mouracade ("T. Mouracade"), DTC's purpose
was to buy and own the Winkler Property.  (Tr. 369:19–21).  DTC is the
current owner of the Winkler Property.  (Tr. 384:20–22).

9.    On May 28, 2015, T. Mouracade became a member of DTC.
(JX15; DX186; Tr. 422:20–423:2).  At the time of the trial, T. Mouracade was
DTC's sole owner and managing member.   (Tr. 280:21–23, 394:22–24).
Although he is employed by DTC, he receives no compensation.  (Tr. 394:25–
395:1).

10.   Dr. Mary  Margaret  Mouracade  ("M.  Mouracade")  is  T.
Mouracade's wife.  Although she expects to become a successor in interest if
"anything happens to T. Mouracade," she presented no documents at trial to
support that expectation.  (Tr. 281:2–4, 349:14–350:1).  M. Mouracade has no
role at DTC.  (Tr. 332:18–23).

### Plaintiffs' Claims

11.   On August 1, 2019, Plaintiffs filed their Complaint.  (Doc. 1).

They claim that the County violated Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, when it denied their request to rezone the Winkler Property. (PTS ¶ 1).

12.    Plaintiffs seek declaratory and injunctive relief.[4]

## Lee County Land Development Code

13.    Lee County's comprehensive zoning scheme, the Land Development Code ("LDC"), includes the Lee Plan. (Tr. 141:5–10). The LDC sets forth the rules and regulations for development and zoning districts. (Tr. 479:3–5). The LDC provides specific requirements, while the Lee Plan provides general requirements. (Tr. 36:5–8).

14.    The County's zoning scheme provides for the protection of residential uses. It precludes commercial and other non-residential uses from encroaching into a residential area, as provided in Policy 5.1.5, described in more detail *infra*. (Tr. 141:13–15, 21–23; DX5).

15.    The Lee Plan provides the overall vision for the County. It also identifies properties and their future land use, including a future land use map. (Tr. 35:13–19, 481:5–6). This map provides the maximum density of development on a piece of property. (Tr. 35:18–23, 59:22–25).

---

[4] In September 2023, Plaintiffs "drop[ped] their requests for damages set forth in the Complaint." (Doc. 145).

16.    The future land use designation describes how land may be developed, not a guarantee of how it will be developed.  (Tr. 96:1–5, 142:8–11).  Anthony Palermo, the lead planner for Lee County assigned to the Winkler Property rezoning application, testified that "it could change someday because you do have urban services available and you're surrounded by urban and a mix of uses.  So it may, in the future, turn into commercial, residential[,] or mixed use developments."  (Tr. 96:10–13).  "It could be, but doesn't mean it has to be."  (Tr. 142:11).  There is no entitlement to develop the land as provided in the future land use category or map.  (Tr. 142:12–16).

17.    In other words, the future land use category provides the opportunity to try to "upzone to something more intensive," but it is not an entitlement or guarantee that the application will be granted.  (Tr. 110:5–6, 142:12–16).

18.    If a parcel is designated a central urban future land use category, an owner may be unable to develop the property to the highest or most intense use recognized under the future land use category.  (Tr. 613:6–10).  An owner's request also must be consistent with the rest of the Lee Plan, including Policy 5.1.5 and Policy 6.  (Tr. 143:10–18, 21–24, 613:2–5).

19.    The LDC includes the zoning regulations, which also must be consistent with the Lee Plan.  (Tr. 35:24–36:4, 141:24–142:1).  The LDC outlines the specific permitted and prohibited uses for each zoning category

7

or district.  (Tr. 35:24–36:4, 154:24–155:6).  Unless the use is expressly permitted by ordinance in the zoning district, it is a prohibited use.  (Tr. 155:7–12).  Zoning regulations also outline the required setbacks, buffers, and height. (Tr. 36:4–5).

20.    The LDC defines the terms "community residential home" and "medical office."   (JX4).   A medical office is a standard office space for dispensing medical and health-related services, including outpatient clinics. (JX4; Tr. 156:22–25).

### Requirements of the Lee Plan

21.    All rezoning and development orders must be consistent with the goals, objectives, and policies of the Lee Plan.  (Tr. 144:23–145:1).

22.    The goal of Policy 5 is to provide sufficient locations to provide residential housing in attractive and safe neighborhoods.   (Tr. 145:9–14; DX5).

23.    Policy 5.1.5 of the Lee Plan is an essential part of the LDC and the County's zoning scheme.  (Tr. 145:2–8, 572:6–10).  The County cannot approve a zoning request that does not comply with Policy 5.1.5.  (Tr. 573:15–18).

24.    Policy 5.1.5 protects existing residential uses of property.  It does not permit commercial uses to encroach in a residential area.  (Tr. 141:13–15,

144:15–17; DX5).  It uses the term "residential area," not residential zoning
district.  (Tr. 144:15–22; DX5).  Thus, it provides protection for residential
use in all zoning districts, including AG-2.  (*Id.*).

25.    Policy 6 applies to commercial land uses.  (Tr. 145:19–20; DX5).
Its purpose is to provide for orderly and well-planned commercial
development at appropriate locations in the county.  (Tr. 145:24–146:2; DX5).

26.    Policy 6.1.1 requires all applications for commercial development
to be evaluated based on several factors, including traffic and impact on
adjacent land uses and surrounding neighborhoods.  (Tr. 146:6–14).

27.    Policy 6.1.4 provides that commercial development will be
approved only when compatible with adjacent existing and proposed land
uses and with existing and programmed public services and facilities.  (Tr.
150:18–23; DX5).

28.    Policy 6.1.5 provides that infill commercial development on a
small parcel is permitted only when residential use of the property is clearly
unreasonable because of the existing commercial development.  (Tr. 152:14–
20; DX5).

29.    Objective 135.6 applies to housing for individuals with special
needs.  (Tr. 153:4–15).  It allows housing for individuals with special needs in
all zoning districts that permits residential use.  (Tr. 153:16–25).  It also
provides that a home with six or fewer residents that meets the definition of

community residential home is treated as a single-family unit and non-commercial use.  (Tr. 154:5–10).

## Agricultural or AG-2 Zoning

30.    AG-2 zoning is an agricultural zoning district, which permits low-density, single-family residential uses.  (Tr. 38:2–6; JX6).

31.    The LDC contains an ordinance related to agricultural districts and provides use regulations for that zoning district identifying the permitted and prohibited uses.  (Tr. 157:8–15; JX6).

32.    Assisted living facilities are not a permitted use in the agricultural districts, but single-family residences are.  (Tr. 157:16–158:2; JX6).

## Residential Zoning Districts

33.    The LDC also contains an ordinance identifying the permitted and prohibited uses for residential zoning districts.  (Tr. 158:6–11; JX7).

34.    One of the residential zoning districts is RM-2, which permits an assisted living facility as of right.  (Tr. 158:15–19; JX7).  It also permits healthcare facilities group 1 and 2 as of right.  (Tr. 159:4–6; JX7).  None of those uses are permitted by right in the agricultural districts.  (Tr. 159:7–8; JX6).

## Planned Developments

35.    A planned development is an alternative to conventional zoning, such as residential single-family or commercial intensive.  (Tr. 97:2–4).

36.    RPD is residential planned development.  (Tr. 54:18–20).

37.    CFPD is community facilities planned development.  (Tr. 159:18–20; JX8).  CFPD is used for activities that complement activities permitted in other zoning districts but are not permitted as of right.  (Tr. 519:19–520:2; JX8).

38.    CPD is commercial planned development.  (Tr. 159:21–23; JX8).

39.    The LDC contains an ordinance providing a use table identifying the permitted uses in a planned development district, including RPD, CFPD, and CPD.  (Tr. 159:12–23).  A planned development must meet the requirements of the LDC as well as those uses and conditions set forth in the resolution approving the planned development.  (Tr. 66:3–5).

40.    There is no use permitted by right in a planned development. (Tr. 620:17–20).  It is permitted only if the Board approves it.  (Tr. 620:21–23).  As a result, a planned development resolution has its own schedule of uses and can have its own setbacks, deviations, and conditions. (Tr. 97:7–10).

41.    The LDC, however, does provide prohibited uses in a planned development district.  (Tr. 620:24–621:13).

42.    It is the Board's decision whether to approve a planned

development and what uses and conditions should be included if the application is approved. (Tr. 66:5–6).

43.    Conditions in a planned development resolution can control how the planned development is developed in the future, including conditions to protect the health, safety, and welfare as well as the interests of the surrounding neighbors and address compatibility issues. (Tr. 66:2–10).

44.    Assisted living facilities are permitted in zoning districts where they are listed as a permitted use in the LDC. (Tr. 54:10–17). In a planned development, such as CFPD, an assisted living facility also must be listed on the schedule of uses. (Tr. 54:15–17).

45.    Assisted living facilities are permitted as of right in RPD. (Tr. 161:2–5; JX8). Healthcare groups 1, 2, and 3, and a medical office also are permitted. (Tr. 162:8–11, 14–16).

46.    Single-family and multi-family residences are prohibited in CFPD. (Tr. 161:20–162:7; JX8). Medical offices also are prohibited in CFPD. (Tr. 162:17–18; JX8).

## Lee County's Rezoning Process

47.    The LDC provides for a rezoning process, which requires an application. (Tr. 33:24–25, 52:11, 166:4–6, 608:21–23; JX3). The County's website explains this process. (Tr. 162:25–163:5; DX1). If an owner wants to

use a property for a use that is not permitted in the zoning district, he may request rezoning. (Tr. 164:6–10; DX1).

48.    Only a property owner or his agent can submit a rezoning application. (Tr. 166:16–19, 609:1–3).

49.    After an application is submitted, County staff conducts a review process. (Tr. 33:24–34:1, 52:11–16; JX3).

50.    The staff review process is not a decision. (Tr. 167:16–17). Rather, it is an advisory report, which the hearing examiner can accept, modify, or reject. (Tr. 167:16–17, 21–23).

51.    As part of the staff review process, the County staff first determines whether the application contains sufficient information for the staff to make a recommendation and for the hearing examiner to hold a hearing. (Tr. 42:16–21, 43:1–6, 12–16; JX3; JX40). An application must be sufficient before County staff can make a recommendation. (Tr. 43:12–13).

52.    After a sufficiency determination is made, a hearing is set before the hearing examiner. County staff makes a recommendation on the application to help the hearing examiner make a recommendation to the Board. (Tr. 34:2–5, 43:17–24, 52:17–53:5, 92:14–18; JX3).

53.    The hearing examiner process provides notice and an opportunity for the applicant and adjoining and surrounding property owners to be heard at a public hearing. (Tr. 43:25–44:6, 53:5–14, 168:2–5, 171:1–6; JX3). The

13

public is invited and gives testimony, County staff gives testimony, the
applicant gives testimony, and the hearing examiner considers the evidence.
(Tr. 34:2–5, 53:5–10, 171:7–10).

54.    The rules of procedure that govern the rezoning process also
provide due process protections for the applicant and adjoining property
owners.  (Tr. 170:12–17).

55.    The rules of procedure provide that the applicant bears the
burden of proof to show that the rezoning is consistent with the Lee Plan, is
compatible with the surrounding land uses, and that the applicant will have
access to the urban services needed.  (Tr. 170:18–25, 199:4–11; JX46:000111).

56.    In deciding an application for rezoning, both the applicant and
the surrounding property owners have property rights.  (Tr. 70:8–10).

57.    At the end of the hearing examiner process, the hearing examiner
provides a recommendation to the Board for the disposition of the application.
(Tr. 34:5–7, 53:10–14, 171:11–14; JX3).  The recommendation is advisory.
(JX66; Tr. 53:10–14, 171:18–21).

58.    The Board makes a final decision on the application at a public
hearing, where the applicant and adjoining property owners have notice and
an opportunity to be heard.  (Tr. 34:5–7, 53:10–14, 167:22–168:1, 171:22–23;
JX3).  An administrative code provision explains the process used for the
public hearing.  (Tr. 171:24–172:10; JX9).  It allows those individuals who

14

testified before the hearing examiner to participate in the public hearing before the Board. (Tr. 172:24–173:2; JX9). The procedure allows the Board to ask questions of County staff, its attorneys, or the parties, but it does not require them to do so. (Tr. 173:3–11; JX9).

59. The County's policy prohibits ex parte communications with any commissioner or the hearing examiner outside the public hearings during the pendency of all zoning applications. (Tr. 176:18–177:5). Additionally, a lobbying ordinance requires commissioners to report any verbal communications with citizens on any matters that could come before the Board. (JX10; DX107).

60. The administrative code provides that no rezoning may be granted other than what is advertised in the newspaper and provided in the public notice. (Tr. 172:11–19; JX9). The public hearing is recorded and transcribed. (Tr. 173:12–14). The Board deliberates and makes a determination on the record. (Tr. 173:15–17). Then, the Board publishes a written resolution explaining its decision. (Tr. 173:18–20).

61. This process was followed here. (Tr. 212:3–14).

**Use of the Winkler Property and the Surrounding Area**

62. In 2014 and continuing to today, the zoning for the Winkler Property was AG-2. (Tr. 33:13–14). Except for a church, all of the properties

in Cold Saturday Farms have been historically and are currently used as single-family residences. (Tr. 23:15–18).

63. No commercial use has been permitted on the Winkler Property. (Tr. 152:25–153:3). If Plaintiffs' rezoning request had been granted, it would have been the first of its kind in Cold Saturday Farms. (Tr. 575:18–576:2).

64. At the time of the rezoning application, an unfinished single-family residence with a fully finished guest house and garage were on the Winkler Property. (Tr. 33:14–15, 67:1–3, 203:23–204:1, 535:3–5; JX41). There were also existing residential buildings. (Tr. 44:15–16).

65. The adjacent land uses for the Winkler Property were all residential. (Tr. 146:18–148:5, 152:11–13; JX20; JX21).

66. The Winkler Property and the other properties in Cold Saturday Farms are categorized as central urban future land use. (Tr. 36:12–13). This is the second highest intensity and density future land use category. (Tr. 36:20–24). It allows up to ten units per acre and residential and commercial development. But it does not allow industrial development. (*Id*.).

67. Plaintiffs were unaware of any mixed-use developments (*i.e.*, property with residential and commercial uses) on Winkler Road between College Parkway and Cypress Lake Drive. (Tr. 577:16–20, 578:3–9). Plaintiffs' application sought to be the first. (Tr. 574:24–575:3).

68. In 2014 and 2015, a vacant parcel north of the Winkler Property

16

owned by the community college was for sale. (Tr. 40:5–11, 642:13–15, 643:17–644:6; JX20; DX57). It was not part of Cold Saturday Farms. (Tr. 112:18–24, 188:25–189:7, 644:9–11; JX20).

69.     This property was zoned for CPD, which permitted many uses Plaintiffs sought as of right, including administrative offices, assisted living facilities, boarding house, dormitory, multi-family housing, healthcare facilities, medical offices, restaurants, and social services groups 1 to 3. (Tr. 41:25–42:1, 644:22–646:5; JX20). The only use not permitted as of right would have been residential treatment in social services group 4. (Tr. 42:7–11, 646:6–8). A rezoning application could have been filed to add that use. (Tr. 646:12–16). None of these uses was permitted as of right in AG-2 zoning. (JX7). Veronica Martin, a planner employed by TDM Consulting, Inc. ("TDM") and hired by Plaintiffs, testified that Plaintiffs looked at this lot, but it was encumbered. (Tr. 367:14, 647:17–18). In any event, the CPD provided the net acreage was 5.62 acres and had commercial and retail uses up to 76,000 square feet. (Tr. 647:3–8). Additionally, T. Mouracade testified that the reason Plaintiffs did not buy the property to the north was because it did not have a structure on it already and would have taken longer to develop—not because it was encumbered or unable to be developed, as Martin testified. (Tr. 758:15–20).

70.     The parcel to the north is separated from the Winkler Property

17

by a 39-foot drainage easement and has 200 feet of separation. (Tr. 189:20–
190:4, 649:6–9; JX66). No similar easement or separation exists between the
Winkler Property and the single-family residence to its south, which was
owned by the Burts. (Tr. 190:5–9, 374:3–4, 649:10–13, 650:13–16; JX33;
DX66).

71.    Further north is College Parkway and a shopping center with a
Starbucks and other commercial uses on that road. (Tr. 41:3–6, 149:21–24;
JX20). The future land use category for those parcels is intensive future land
use, which is more intensive than the central urban category. (Tr. 150:9–10,
16–17; JX54). These commercial uses were in a different future land use
category than the Winkler Property. (Tr. 150:11–14; JX54).

72.    There is an assisted living facility, Brookdale Senior Living, on
College Parkway, along with Canterbury School and a college. (Tr. 41:7–11,
101:20–102:1, 148:20–24; JX20).

73.    Brookdale Senior Living is in a residential zoning district—RPD.
(Tr. 148:14–19; JX21). The surrounding land uses are CFPD and CPD. (Tr.
148:25–149:8; JX21). It is surrounded by commercial uses. (Tr. 149:9–16).

74.    To the west of the Winkler Property is a single-family
neighborhood that was rezoned single-family residential. (Tr. 40:20–21,
74:25–75:2; JX20).

75.    To the south of the Winkler Property is the continuation of Cold

18

Saturday Farms, with single-family and some agricultural uses.  (Tr. 40:22–24; JX20).

## Rezoning Application

76.    On November 5, 2014, TDM applied to rezone the Winkler Property from AG-2 to CFPD.  (JX27; Tr. 51:17–19).

77.    That application was the only application to rezone the Winkler Property.  (PTS ¶ 2; JX27; Tr. 51:17–19).

78.    Plaintiffs never applied for a special exception.  (Tr. 167:8–11, 592:12–14, 611:2–8).  A special exception must comply with Policy 5.1.5 and is not a permitted use in a particular zoning district.  (Tr. 610:21–23, 610:24–611:1).  The special exception process requires filing an application.  (Tr. 610:13–20).  Plaintiffs admitted that Martin has never sought a special exception in the AG-2 zoning district.  (Tr. 611:9–11, 611:25–612:3).

79.    TDM represented the applicant.  (Tr. 32:8–9, 47:6–7; JX30).  As identified on the application, T. Mouracade was the applicant for rezoning.  (Tr. 31:2, 32:13, 33:6–8; JX27).  While TDM's cover letter indicated the application was filed on behalf of KR and Mouracade Regenerative Medicine, that is inconsistent with the application itself.  (JX27).  KR did not exist then, and Mouracade Regenerative Medicine is not a party to this action.  TDM signed a contract to represent T. Mouracade in the application, development

order, and any other aspect of the project. (Tr. 488:17–21).

80. The Robin Attree Trust owned the Winkler Property. (Tr. 191:5–11; JX39). It designated Kevin A. Kyle to file and process an application for rezoning. (Tr. 191:9–11; JX39). The owner did not authorize DTC, KR, or anyone else to be the applicant. (Tr. 191:12–19, 192:10–12; JX39).

81. Kyle, the authorized applicant, designated Beverly Grady and T. Mouracade as agents for the applicant on the rezoning application. (Tr. 192:21–193:7; JX39). Kyle did not designate KR or DTC to be an agent for the applicant. (Tr. 193:8–10, 574:8–13; JX39).

82. Neither Plaintiff was the landowner or authorized agent of the owner during the pendency of the rezoning application. (JX39).

83. Neither the landowner nor the authorized agent of the owner is a party to this action. (JX39).

84. Likewise, during the rezoning process, neither Plaintiff entered a contract to buy the Winkler Property. (Tr. 428:3–5, 429:2–5; JX24). T. Mouracade testified that he decided to offer to purchase the property, but he was not a party to the contract for sale, nor was KR or DTC. (Tr. 369:3–5, 431:10–21; JX24). The purchaser was Kevin A. Kyle, Trustee for a certain trust dated July 31, 2024. (Tr. 369:6–12, 427:23–428:2; JX24). Neither DTC nor KR is a trust. (Tr. 431:22–25; JX15). T. Mouracade also was not a party to the trust. (Tr. 432:18–25). According to T. Mouracade, Kyle assigned the

contract to DTC on November 16, 2015, at the time of the closing. (Tr. 427:9–18, 429:23–430:2, 16–18).

85.    The application provided a narrative and the applicant's position on consistency with the Lee Plan. (Tr. 47:6–10).

86.    The applicant's narrative provided that it is a privately funded facility. (Tr. 48:5–6; JX30).

87.    It also provided that the facility would not admit any individual with a criminal record of violence or registered sex offenders. (Tr. 48:11–13; JX30).    In any event, T. Mouracade conceded that it would include individuals who were on pretrial release or have legal issues due to their substance use disorder. (Tr. 452:22–453:11).

88.    As Palermo acknowledged, this restriction of who the applicant states it would not admit would be "awfully hard to enforce." (Tr. 193:20–194:2).  Indeed, T. Mouracade admitted that if Lee County Code Enforcement wanted to review records to confirm that the applicant had not admitted patients with a violent background or committed sexual offenses, it would be unable to do so. (Tr. 455:14–19, 456:1–3).

89.    The narrative also provided that the facility would obtain "all the necessary permits and licenses, follow the policies and procedures set forth by the state of Florida and the federal government." (Tr. 48:16–19; JX30).

90.    The rezoning application sought to reduce the amount of buffer

between the Winkler Property with its 26 proposed uses and the Burts' single-family residence to only 15 feet. (JX66; JX38). The applicant provided that the setback to residential zoning was more than 100 feet, but that there was only 15 feet between the proposed uses and the Burts' single-family residence. (Tr. 195:6–196:1; JX38; JX59). A buffer helps separate uses. The buffer between commercial and residential must be larger. (Tr. 480:13–21).

91.    The LDC requires 100 feet between social service group 2 and residentially zoned property. (Tr. 533:1–2).

92.    The proposed view of the Winkler Property was not of a single-family residence, like the other Cold Saturday Farms properties. (Tr. 196:2–12, 640:8–21; JX38; JX53). Instead, the view from Winkler Road would be of a driveway and parking lot. (Tr. 196:2–12; JX38). The two buildings closest to Winkler Road were to be used only for commercial uses. (Tr. 686:9–20; JX38).

93.    The rezoning application provided for a phased development. (JX36; Tr. 196:22–197:1, 305:11–13).

94.    The first phase of the development was for administrative offices and outpatient facilities. (Tr. 197:2–4, 626:5–9; JX36). It included no residential use—only commercial use. (Tr. 197:5–19, 626:10–12, 628:4–5; JX36).

95.    T. Mouracade testified that he would develop phase one first.

(Tr. 731:1–4; JX48:001475).  Phase one was outpatient therapy and detox and an infusion center.  (Tr. 627:16–18, 731:1–4; JX48:001475).

96.  The outpatient treatment was not incidental to residential treatment.  (Tr. 625:3–5).  It was not an accessory use.  (Tr. 624:20–625:5). An accessory use must be incidental to the primary use.  (Tr. 624:20–22).

97.  T. Mouracade testified before the hearing examiner that there was an acute and immediate need for intensive outpatient services, which is why he planned to develop the property this way.  (Tr. 627:25–628:9, 731:5–8; JX48:001475).  He did not make the same statement about residential treatment.  (Tr. 731:14–20; JX48:001475).

98.  The applicant provided letters from local physicians indicating the need for outpatient treatment in the area.  (JX46; JX49; JX 50; Tr. 68:22– 69:3, 88:7–10).

99.  These were the same services provided at the College Parkway and Corporate Court locations for which KR had zoning approval from the County.  (Tr. 396:21–397:2, 404:12–17, 629:11–14, 731:9–13).

100.  KR does not provide these services today because it is not licensed to do so, even though it has zoning approval.  (Tr. 732:10–13).

101.  Neither the application nor the hearing examiner's recommendation provides any timeframe for the phases.  (Tr. 628:10–12; JX36; JX66).

102.   The applicant never offered any condition to put a timeframe on the phases.  (Tr. 628:13–15).

103.   If the rezoning application had been approved, there would have been no requirement to build past phase one—or even build phase one.  (Tr. 628:10–20).  There was no requirement to have any residential use.  The applicant could have continued to use the property for only a commercial use. (Tr. 628:21–23).

104.   Residential use was not contemplated until phase three.  (Tr. 628:24–25; JX36).

### Proposed Uses

105.   The proposed uses were more intense than the other parcels in Cold Saturday Farms.  (Tr. 576:14–20).

106.   The proposed uses included a residential treatment facility, with a maximum of 90 beds, as well as nine dwelling units with kitchens, religious and recreational facilities, and 9,000 square feet of accessory medical, retail, and food uses.  (Tr. 495:15–17; JX82:001812).

107.   The rezoning application sought to operate the following on the Winkler Property: a coffee shop, gift shop, a bookstore, a medical center, a spa, and a yoga studio.  (JX66: Ex. B).  It sought to permit 61,537 square feet of development and 26 different uses on the property.  (Tr. 656:15–19; JX38;

JX66: Ex. B).

108.    The  applicant  provided  that  the  development  would  provide
infusion   therapy,   acupuncture,   yoga,   nutritional   counseling,   meal
preparation  with  a  registered  dietician,  a  sleep  lab,  metabolic  analysis,
message  therapy,  an  exercise  regimen,  meditation  garden,  spiritual  guidance
and  counseling,  group  and  individual  therapy,  and  a  medispa.  (Tr. 657:18–
25; JX30).   But  the  application's  narrative  request  did  not  provide  for
substance  abuse  residential  treatment.  (Tr. 658:2–4, 13–16; JX30).

109.    It  would  employ  onsite  a  medical  director,  clinical  director,
licensed  mental  health  counselors,  licensed  mental  health  social  workers,
addiction  psychiatrist,  addiction  psychologist,  masseuse,  chiropractor,
mindful  awareness,  yoga,  physical  education  trainer,  nutritionist,  nursing
staff,  patient  caretakers,  and  recovery  specialists.  (Tr. 271:14–273:3).

110.    One of the 26 uses was a healthcare facility.  (JX66: Ex. B).  A
healthcare facility is a commercial use.  (Tr. 521:18).

111.    The  applicant  represented  that  at  maximum  buildout,  the
Winkler  Property  would  have  15,000  square  feet  of  commercial  uses.  (Tr.
197:20–23; JX36).  One and a half acres would be devoted to commercial uses.
(Tr. 631:20–22).  This included a coffee shop and specialty retail store.  (Tr.
197:24–198:3).

112.    An assisted living facility was not a proposed use.  (Tr. 631:23–

25; JX36).

113.   It would host retreat events for alumni.  (Tr. 198:4–6; JX36).

114.   The uses included medical uses and social services uses.   (Tr. 44:24).  The proposed uses included undisputedly commercial uses.  (Tr. 57:1–7, 72:7–12).  The rezoning application sought commercial uses.  (Tr. 574:21–575:3).  The development had to follow commercial building standards.  (Tr. 650:21–24).

115.   The applicant informed Lee County Utilities that the development would consist of one commercial unit.  (Tr. 657:4–6; JX26).

116.   Given the proposed uses, the LDC required 101 parking spaces. (Tr. 634:17–20; JX25).  Yet the applicant's plan only provided for 61 parking spaces.  (Tr. 634:21–22).  Other than the church, a permitted use as of right, no other use in Cold Saturday Farms provided for 61 parking spaces.  (Tr. 634:23–635:14).

117.   Martin did not have architectural floor plans of the development to identify each space.  (Tr. 684:7–12; JX25).  Plaintiffs presented no evidence that architectural floor plans were ever developed.  (Tr. 684:15–16).

118.   Robert Price, the County's traffic engineer, prepared a trip generation table to estimate the traffic.  (Tr. 660:1–5; JX41).  This report was submitted to the hearing examiner and the Board.  (Tr. 660:6-11).  Neither Martin nor the applicant objected to the report.  (Tr. 660:12–13).

119. Given the proposed uses, County staff had concerns about compatibility with the surrounding uses. (Tr. 34:19–22, 37:19–24). It recommended the CFPD process so that conditions could be placed to address the incompatibility with the surrounding uses. (Tr. 37:19–24).

120. The Board decides whether a project is compatible. (Tr. 613:17–19). The Board found that the rezoning application was not compatible with the surrounding land uses. (Tr. 613:20–22).

## Proposed Density

121. The density for Cold Saturday Farms properties, including the Winkler Property, was very low—0.19 per acre. (Tr. 75:13–17, 656:9–11; JX23).

122. The proposed density for rezoning was 6.5 units per acre, a reduction from the increased density sought in the rezoning application. (Tr. 75:20–23).

## Proposed Height

123. The maximum height in the CFPD district is 35 feet. (Tr. 76:21–25).

124. The applicant sought to increase the height to 45 feet, which would have made it the tallest structure in the surrounding area. (Tr. 76:21–25, 630:16–631:2; JX23).

## Notice to Property Owners and Response

125.    After notice was sent to adjoining property owners, Palermo received telephone calls and emails opposing the proposed uses.  (Tr. 32:17–18, 45:9–11, 58:25–59:4).   People expressed opposition to the application because they lived nearby.  (Tr. 46:4–7).

126.    Palermo explained that he has received telephone calls and emails "about all sorts of zoning cases for all sorts of more benign uses, like single family or multifamily or commercial or gas station is asked for and people oppose it."  (Tr. 46:8–12).

127.    He did not view this as hostility but as democracy—"people addressing their government and saying what side they stand on."   (Tr. 46:12–14).   He had no problem with that, concluding "I'm not going to characterize them as hostile, they're citizens."  (Tr. 46:15–16).

128.    Palermo noted that some people opposed to the application expressed concern about the patients being a threat to their neighbors, but that the people opposed said various things and had various questions.  (Tr. 98:6–7, 101:1–4).   Some wanted the property to remain single-family residential and agricultural.   (Tr. 109:22–24, 226:8–9).   Some complained about the commercial and residential proposed uses. (Tr. 514:3–8).

129.    A website called Protect Our Community was created.   (Tr. 100:10–15).  Plaintiffs did not show who created it, what it said, or whether

28

the Board was aware of it.

130.   There were signs that opposed the project, but Plaintiffs did not show who created the signs or whether the Board was aware of them.  (Tr. 376:13–14, 502:16, 21–503:3).   T. Mouracade learned of a petition in opposition to the rezoning application and a radio advertisement.   (Tr. 376:15–377:1).  That said, Plaintiffs did not show the Board was aware of the petition or advertisement.  (Tr. 502:13–503:14, 676:23–25, 681:12–20; JX80). Plaintiffs did not enter the petition into evidence.  (Tr. 682:5–8).

131.   There were both positive and negative comments about the application from the community.  (Tr. 578:10–13).

132.   While the staff report considered the public's opposition, Palermo testified that they would not be swayed by letters of support or opposition. (Tr. 69:23–70:1).

133.   The County staff encouraged the applicant to meet with the College Parkway Redevelopment Group in a public meeting.  (Tr. 70:13–16, 498:17–23).   No county commissioners were present.  (Tr. 658:17–20).

134.   At this meeting, T. Mouracade said that he expected 80 to 90 percent of the patients would come from outside of Lee County.  (Tr. 659:7– 20, 730:7–11; JX48:001228).

135.   The group indicated that it was not taking a position on the application.  (Tr. 90:6–14, 498:17–23).

## Staff Report

136.    On January 9, 2015, the County staff provided a sufficiency letter for the application.  (Tr. 56:14–16, 57:14–24; JX40).

137.    County staff later produced a report recommending approval, with conditions to address the compatibility issues with the surrounding area. (Tr. 57:25–58:7, 17; JX46).

138.    The staff report found the application, as conditioned, consistent with the Lee Plan and the LDC.  (Tr. 63:14–16, 64:13–22, 71:12–17; JX46). Ultimately, the Board disagreed with that determination.  (JX82).  The Board has reached different conclusions in other cases that did not involve proposed substance abuse treatment, including denying applications when approval was recommended by County staff and the hearing examiner.  (Tr. 118:8–13, 213:2–5).  As Palermo commented, "That's just differences, nothing bad or impolitic about that."  (Tr. 213:4–5).

139.    Additionally, the staff report's conclusion was based on the acceptance of the conditions imposed in the report.  (JX46; Tr. 65:19–20, 24, 199:20–23).  The report explained that these conditions were necessary to safeguard the public interest.  (Tr. 198:21–25; JX46:000108).

140.    One of those conditions of approval was limiting the height to 35 feet. (Tr. 76:21–25, 203:6–8; JX46).  The applicant rejected this condition and continued to seek a height of 45 feet.  (Tr. 76:25–77:1, 203:9–10).

141. Another condition was to connect to public water and sewer services. (Tr. 79:5–12).

142. The staff report also conditioned its approval on a five-year expiration for the master concept plan. (Tr. 201:18–22; JX48:000980). Palermo explained to the hearing examiner that the code used to provide for an expiration date, and he thought it was necessary given the requests in this application. (Tr. 201:18–202:3; JX48:000980). Palermo also explained that it would add certainty that they are serious, and they are going to get a development order within the next five years. (Tr. 202:4–8; JX48:000980). He was concerned about whether the applicant was serious about proceeding with development if the rezoning application was granted. (Tr. 202:11–14, 203:1–3). This was based "on the land use proposed and how unusual it was and how it was potentially impacting the surrounding neighborhood." (Tr. 224:17–20). He wanted to ensure that the applicant would not wait five, eight, ten, or fifteen years and then start development. (Tr. 203:1–3).

143. Another condition related to traffic. (JX41). Price prepared a report based on the concerns related to traffic. (Tr. 203:14–17; JX41). He acknowledged that the intent of the applicant was to rezone the Winkler Property to allow commercial uses. (Tr. 204:18–22; JX41). Lili Wu also prepared a report related to transportation. (Tr. 205:6–13; JX42). Wu provided that a condition of approval must be the execution of a restrictive

31

covenant to enter into a cross-access agreement. (*Id*.). The purpose of the agreement was to provide access if the properties to the south redeveloped to commercial uses. (Tr. 205:14–17; JX42). This was included as a condition in the staff report. (Tr. 206:1–3).

144. The staff report included a schedule of uses, which included an assisted living facility. (Tr. 81:3–5; JX46). It provided for 26 different uses. (Tr. 198:13–16).

145. The hearing examiner received the staff report before the hearing. (Tr. 92:14–18).

146. The hearing examiner did not accept all the conditions that staff found necessary for approval, including the restrictions on height, transportation easement, and expiration on the master concept plan. (Tr. 199:1–3, 203:4–5, 11–13, 206:11–14; JX66).

### Hearing Examiner's Hearing and Recommendation

147. The staff scheduled a public hearing before the hearing examiner, which was held on February 25, 26, and March 3, 2015. (Tr. 533:10–16; JX48; JX66).

148. Notice of the hearing was published in the newspaper, and notice was mailed to the surrounding property owners. (Tr. 94:24–95:2).

149. Many people testified during the three-day hearing, including

Palermo, Martin, T. Mouracade, M. Mouracade, Tina Ekblad, an expert planner hired by one of the neighbors, and surrounding property owners. (Tr. 92:25–93:1, 207:6–14, 377:20–21, 378:11–13, 538:7–8, 541:21–542:4; JX48). Ekblad presented facts and analysis as a professional planner. (Tr. 210:18-20). She also provided an expert report and presentation that were entered into evidence at the hearing. (Tr. 207:18–208:3; DX60; DX61). A transcript was created of the hearing. (JX48).

150. Ekblad provided pictures of the surrounding area. (Tr. 682:13–16; DX60:201350). She highlighted all the residential uses in the surrounding area. (Tr. 682:17–19). Plaintiffs did not dispute the diagram's accuracy. (Tr. 683:1–4).

151. Palermo testified "the reason we've put in a lot of conditions, again, is to try to address the potential noise and nuisance that could come from this proposed development." (Tr. 201:10–13; JX48:000967). He also testified: "Are there compatibility issues . . .? Sure, there are." (Tr. 201:14–17; JX48:000969).

152. On May 13, 2015, the hearing examiner recommended approval with conditions, including a reduction to a 72-bed facility. (Tr. 333:20–25, 559:4–6, 624:10–13, 677:7–12; JX66).

153. She recommended a density of 6.4 units per acre, which included a 72-bed facility, nine multifamily units, and a 9,000 square-foot medical

office.  (Tr. 112:5–8; JX66).

154.  This density (from 90 to 72 beds) was lower than the applicant requested.  (Tr. 112:9–12).

155.  Even with 72 beds, this facility would have been the most densely populated facility with the largest number of beds in Collier, Lee, and Charlotte Counties.  (Tr. 737:22–738:3; DX93:002195, 002221, 002222).

156.  The hearing examiner provided a table of permitted uses.  (Tr. 623:19–23; JX66 Ex. B).

157.  One of the uses was multi-family, which is not listed as an accessory use.  (Tr. 624:10–15).  This is not a permitted use in CFPD.  (JX8).

158.  Another use was a medical office, which is not identified as an accessory use. (Tr. 624:16–19).  This is not permitted in CFPD.  (Tr. 162:19–24, 523:23–25; JX8; JX66).  It is a commercial use.  (Tr. 652:22–23).

159.  Another use identified by the hearing examiner was as an assisted living facility.  (Tr. 635:18–21).  This was not a use sought by the applicant.  (Tr. 635:22–637:2; JX32).

160.  Another use was healthcare facilities groups 1 to 3.  (Tr. 652:9–11).  Those are commercial uses.  (Tr. 652:12–14).  The outpatient treatment falls under healthcare facilities group 3.  (Tr. 652:15–17).

161.  The report also provided for the use of restaurant group 2 — a commercial use.  (Tr. 653:11–20).  It permitted the coffee shop to be open to

residents, guests, patients, and clients of the medical office. (Tr. 653:21–24). It was open to guests of anyone seeking outpatient treatment. (Tr. 654:10–17).

162. The hearing examiner also provided for specialty retail use — a commercial use. (Tr. 655:4–8).

163. The report also addressed the conditions. (JX66). One of those conditions was to allow the structure to exceed the maximum height of the CFPD district. (Tr. 76:21–77:1).

164. Another condition was to connect to the public water and sewer system. (JX66).

165. The hearing examiner's recommendation was provided to the Board. (Tr. 92:14–18).

166. The County's procedure provided that the Board would make the ultimate decision and was not bound by the staff or the hearing examiner's recommendations. (Tr. 578:20–579:5).

### Campaign Contributions and Political Action Committee

167. T. Mouracade testified that a political action committee ("PAC") was formed called Protect Our Community and chaired by Sawyer Smith. (Tr. 377:2–9; JX75).

168. While a PAC was formed, Plaintiffs did not show that its purpose

was to take a position on the Winkler Property. (JX75; Tr. 678:7–10).

169. Palermo was unaware of any campaign contributions or PAC. (Tr. 222:3–5, 223:13–16).

170. Plaintiffs did not show that the PAC was formed to target commissioners who voted for the rezoning of the Winkler Property. (JX75; Tr. 678:7–10).

171. Plaintiffs did not show that the commissioners were aware of the PAC. (Tr. 677:13–21; JX75).

172. Plaintiffs did not show that the PAC made any donation or contribution to any commissioner. (JX75; 678:13–680:3).

173. A majority of the donations to the PAC were returned to the individuals who made the donations. (JX75; Tr. 680:4–6).

174. T. Mouracade, KR, and DTC could have made campaign contributions to the commissioners. (Tr. 680:10–20).

175. Plaintiffs did not show that the commissioners were aware of the campaign contributions made at the time of the Board hearing or why those contributions were made. (Tr. 680:21–681:1).

176. Plaintiffs did not show the commissioners solicited any of these contributions. (Tr. 681:2–4).

177. The commissioners have no control over who makes a campaign contribution. (Tr. 681:5–7).

178.   Plaintiffs were unaware of any Board hearing where a request was made to disclose campaign contributions.  (Tr. 681:8–11).

## The Board Denied the Request After a Hearing

179.   On August 5, 2015, the Board consisted of Commissioners Larry Kiker, Cecil Pendergrass, Frank Mann, John Manning, and Brian Hamman. (JX80; PX23; JX 082:001815).

180.   On August 5, 2015, the Board held a public hearing to review and consider the staff's and the hearing examiner's recommendations, hear the testimony of interested persons, and issue a final decision.   (JX80:003439). The hearing was recorded and transcribed.  (*Id.* :003433–003538).

181.   The Board convened the hearing, decided issues of procedure governing the hearing, reviewed the hearing examiner's report and the staff recommendation, reviewed and discussed the legal standard and framework applicable to the decision, presided over a public evidentiary hearing at which they heard from the interested parties and their attorneys representing opposing opinions on the issue to be decided, considered and weighed evidence and expert testimonies, and deliberated and reached a decision.  (*Id.*).

182.   The Board followed the same procedure as it had in other zoning cases. (Tr. 212:7).

183.    Commissioner Hamman was the Board chair.  (Tr. 213:6–19).  He asked Michael Jacob, the assigned county attorney, to confirm that the Board was not doing anything procedurally different in this hearing than in other zoning hearings.  (Tr. 213:14–19; JX80:003459–003460).  Jacob confirmed that the procedure was the same.  (Tr. 213:17–19; JX80:003460).

184.    Alvin Chip Block was Lee County's principal planner.  (Tr. 183:8–9).  He attended the public hearing and presented the staff's recommendation on the application at the Board's request.  (Tr. 183:16–19).  He presented all zoning cases to the Board.  (Tr. 183:16–19).

185.    During the hearing examiner and Board hearings, Ekblad testified that the application was not compatible with the surrounding uses. (Tr. 207:15–17, 210:1–5).  She also testified no conditions could mitigate the incompatible uses.   (Tr. 210:6–9).   She also testified that granting the rezoning application would be inconsistent with Policy 5.1.5.  (Tr. 210:10–13). She also explained that the rezoning was potentially destructive to the character and integrity of the residential neighborhood.  (Tr. 663:20–23).  She asserted that the applicant had not proven entitlement to rezoning.   (Tr. 663:14–16).

186.    Ekblad    also    testified    that    the    hearing    examiner's recommendation included uses prohibited under the LDC.  (Tr. 683:9–12).

187.    She testified that "no analysis has been provided regarding the

full intensity of the proposed uses, nor has consideration been given to all of
them and their impact on the existing lower density residential unit located
immediately to the south and west along Winkler Road." (Tr. 688:14–20;
JX80:003463). Plaintiffs admit that the master concept plan did not list
every single use, and they "wanted to provide for other uses." (Tr. 688:3–7;
JX38).

188. Commissioner Mann stated that he rejected the public comments
made by some residents and neighbors "that they are worried about
[Plaintiffs' customers] going crazy or being a threat or danger."
(JX80:003536). He also noted that he previously served on a non-profit board
that dealt with alcoholic and drug rehabilitation. (*Id.*: 003535).

189. The County has an ordinance prohibiting ex parte
communications with the commissioners regarding the substance of a
pending rezoning action or appeal that the Board will consider. (Tr. 176:18–
177:19, 672:5–8). Plaintiffs did not show there was any violation of this
ordinance. (Tr. 177:20–24, 672:9–21).

190. At the beginning of the hearing, Commissioner Manning asked
the county attorney, "[W]hat type of circumstances would be necessary for the
opponent to demonstrate, which would give us the flexibility of a decision
other than approval[?]" (JX80:003440). He answered, "[t]here's a consistency
requirement under policy 5.1.5 of the Lee Plan" that "talks about consistency

of the plan and bringing development within residential communities, and making sure that the projects don't degrade the residential community that you are putting them in." (JX80:003442). He also advised that "[i]f you disagree with the recommendation of the Hearing Examiner, that there's singular uses in that area and that this is consistent with those uses, then you would want to bring out those differences and . . . why this project is somehow different." (JX80:003443). Commissioner Manning advised the opponents and their attorneys to not "waste their time talking about—I just don't like this project in my neighborhood," but to "deal with specific legal points." (JX80:003443).

191. During the hearing, a land use expert testified that the Board should deny the request because "the proposed group home for rehabilitation and commercial uses are not compatible with the existing single-family developments located along Winkler Road." (JX80:003461–003462). Moreover, "the proposed concept plan will place a prohibited use, a medical office building, and required parking adjacent to Winkler, giving the view of a commercial property and inconsistent with policy 5.1.5 of the Lee Plan, which encourages you to protect residential communities." (JX80:003464–003465). Likewise, a real estate consultant testified that "a facility similar to this would have a negative impact on property values to a distance of not less than 600, 800 feet. [And] [t]he magnitude and the diminution property value

would be in the range of 10 percent to 25 percent."  (JX80:003491–003492).

192.   Commissioner Hamman noted that the commissioners "do not make our decisions based off of applause.  We want every speaker to be able to feel comfortable in these chambers to give their testimony." (JX80:003483).   In closing, the applicant's attorney expressed her concern that she did not know why one of the commissioners would vote no. (JX80:003522).   Commissioner Manning replied, "It's already on the record . . . . It's an LDC code policy."   (JX80:003522).   Commissioner Manning then explained in detail the reason he opposed the application:

> [I]t's been non-substantial and non-compliant evidence . . . all day long. Traffic, green space, et cetera . . . . The competent and substantial evidence that I will put into the record simply is this . . . . You have a commercial use encroaching upon residential uses. The current zoning of that property is still AG-2 . . . . I disagree with the Hearing Examiner and the reason being, 5.1.5.   It's simple as that.  Your application states, and you put on the record today, that there are commercial uses in the area, [but] [t]hat doesn't mean they're integrated. They're segregated.   I have gone up and down that road for 36 years, okay?  They are segregated.  There is no mixed-use component on Winkler Avenue period, end of story.

(JX80:003523–003524).

193.   Commissioner Mann had concerns about "mandatory confinement" and whether the compatibility of this with the neighborhood— "whether it makes a lot of sense or not."   (JX80:003528–003529).   And Commissioner Hamman "agree[d] with the discussions surrounding not

find[ing] that the application would have [even] a neutral impact on the surrounding community[.]" (JX80:003534).

194.  At the end of the hearing, the Board deliberated on the record, (JX80:003534), and then Commissioner Mann made a motion "to deny the application for this case based upon violation of the policy 5.1.5 for . . . all the comments made today including the appraisal values including the board discussion."  (JX80:003535).  The Board voted unanimously to deny the rezoning request.  (JX80:003537; JX082:001812).  Then they issued a written resolution explaining their decision.  (JX80:001814).

195.  Commissioner Mann also commented: "I hope that perhaps you all will find another place that would be more compatible to pursue exactly what you are trying to do because we need that service."  (JX80:003536–003537).  Commissioner Hamman agreed: "We do need places like this.  In every community. [But] [t]hey need to be in compatible neighborhoods." (JX80:003537).

196.  During the hearing before the hearing examiner, Palermo testified that he had concerns about the commercial uses in the application as well as the height and the density.  (Tr. 199:24–200:10; JX48).  He believed that the condition proposed in the staff report would mitigate the negative impact from the intensity of proposed uses.  (Tr. 200:11–15).  The hearing examiner did not accept all the conditions.  (JX66).  The Board ultimately

disagreed with Palermo and found that there were no conditions that could mitigate the negative impact from the intensity of the uses.  (Tr. 200:16–21).

197.   As Palermo conceded, the Board "saw the same set of facts that I did and all the testimony and reached a different conclusion from myself and the hearing examiner."  (Tr. 214:8–11).

198.  Plaintiffs did not show that there were any ex parte communications with any of the commissioners during the pendency of the zoning application.  (Tr. 177:20–24, 672:9–12).

## Plaintiffs Did Not Own the Winkler Property
## at the Time of the Board's Decision

199.   After the Board's decision to deny the rezoning application, DTC elected to buy the Winkler Property on November 16, 2015, instead of the commercially zoned and available property to the north.  (Tr. 756:25–758:14; JX83).

200.   Kyle had the ability to cancel the contract, without penalty, until November 2015.  (JX24; T. Mouracade X15: 61:1–12).  Despite the denial of the rezoning request, DTC elected to buy the property, understanding the limitations of the zoning.  (Tr. 756:25–757:4, 735:24–736:1; T. Mouracade X15: 66:16–20).

## The Special Magistrate Upheld the Board's Decision

201.  On September 2, 2015, even though it had not applied for

rezoning, DTC filed a request for relief under Florida law, which provides for a special magistrate review process to determine whether the Board's decision unreasonably or unfairly burdens the property. (DX81; Tr. 174:8–25).

202.  After this request was submitted, a communication was provided to the Board explaining the request and that the prohibition against ex parte communications would remain in effect because there would be a public hearing at the end of the process. (Tr. 175:8–18, 176:3–5, 177:6–10, 16–19; DX82).

203.  Plaintiffs did not show there were any ex parte communications with any commissioner during the pendency of the request for review. (Tr. 177:20–24).

204.  After DTC's request, the parties selected a special magistrate to facilitate a resolution or, if they could not reach an agreement, hold an evidentiary hearing or fact-finding conference. (Tr. 130:1–3, 689:20–23, 691:11–12; DX94). In the evidentiary hearing, the question before the special magistrate was whether the Board's decision was unreasonable or unfairly burdened the property. (Tr. 694:21–24; DX94).

205.  There are two parts to the special magistrate proceeding. (Tr. 130:1–3). There is a meeting with the County, special magistrate, and the entity requesting review to discuss and explore alternatives to the Board's

decision.  (Tr. 130:4–7).  During this process, alternatives, conditions, revisions, and accommodations can be considered.  (Tr. 130:4–7, 692:11–693:1).  If an agreement is reached, the matter goes to the Board to decide whether to accept it.  (Tr. 165:1–5, 692:23–693:1).  The Board is the only entity or individual with the authority and ability to make changes to the County's zoning ordinance and scheme.

206.  If no agreement is reached, the special magistrate presides over an evidentiary hearing and makes a recommendation, which goes to the Board to decide whether to accept, reject, or modify the recommendation.  (Tr. 165:1–5, 177:11–19, 694:4-6, 702:22–703:1; DX94).

207.  During the special magistrate process, the County staff and DTC discussed alternatives for rezoning the Winkler Property, including reviewing the density and intensity of uses and alternative zoning categories.  (Tr. 179:1–17, 692:11–22).  One of the alternatives offered was a residential planned development with time to hone the conditions, uses, and needed deviations.  (Tr. 692:17–22).  Another alternative offered was RS-1 zoning.  (Tr. 693:2–4).

208.  All the alternatives were rejected.  (Tr. 693:5–6).  In particular, the RDP was rejected because it would not allow commercial uses.  (Tr. 693:19–694:2).

209.  Martin testified that during this proceeding, she and Beverly

Grady made an offer to County staff to remove all the independent commercial uses from the development. (Tr. 704:4–14).

210. After the special magistrate's recommendation, T. Mouracade was looking to make a 40% reduction in the intensity of uses of the development. (Tr. 740:20–741:4).

211. As a result, the fact-finding conference was held. (Tr. 694:4–6).

212. During the evidentiary hearing, Palermo testified for the County under oath. (Tr. 121:22–25, 130:11–18).

213. After the evidentiary hearing, the special magistrate issued a written recommendation on April 2, 2016, recommending that the Board's decision be upheld. (Tr. 691:13–15, 694:25–695:2; DX94).

214. She concluded that the Board's decision was "not unreasonable and does not unfairly burden" the Winkler Property because:

> (a) "[t]he requested rezoning is inconsistent with the history of the parcel and is not necessary in order to fully utilize and enjoy the property as intended by the . . . current AG-2 zoning";
> (b) "[t]he property was purchased by [A]pplicant after the rezoning request was denied";
> (c) "Applicant's description of medical care, interventions, treatment, transfer from one therapeutic area to another and medical offices . . . are commercial and inconsistent with the intention of Policy 5.1.5";
> (d) "[t]he rezoning would not have a positive or neutral impact on the surrounding community"; and
> (e) "no adequate conditions have been devised to address the potential impacts of the proposed request for rezoning on the surrounding residential neighborhoods."

(DX94:002265-66).

215.   She concluded that there were multiple reasonable uses for the property but at a lesser intensity and in a more compatible manner that does not disrupt the character of the community.  (Tr. 695:6–14; DX94).  She also concluded that rezoning would result in encroachment of commercial uses into an existing residential area.  (Tr. 697:19–22).

216.   A hearing was set before the Board for May 3, 2016, to consider the special magistrate's recommendation.    (Tr. 699:10–12).    But DTC withdrew from the process, dismissed the request, and terminated the proceeding on the eve of the hearing.    (DX100:002277; Tr. 700:20–25). Because DTC dismissed the proceeding, the Board could not consider the issue.  (Tr. 701:3–5, 702:11–18, 703:5–9, 15–19; DX100).

217.   After the special magistrate's recommendation, neither Plaintiff applied to rezone the property.  (Tr. 181:13–18).

## KR Creation and Operations

218.   On November 9, 2015, KR was organized and formed.  (Tr. 437:3–9; JX11).

219.   KR was a private pay company and accepted some insurance. (Tr. 248:25–249:4).

220.   Upon its formation, T. Mouracade became KR's CEO.    (Tr.

395:10–16).    Before becoming CEO, T. Mouracade had no experience operating or working for a substance abuse treatment center. (Tr. 395:25–396:20).

221.    The Florida Department of Children and Families ("DCF") licenses substance abuse treatment in Florida.    (Tr. 312:25–313:3).

222.    KR did not apply for a license to provide substance abuse treatment until April 5, 2016.    (Tr. 438:12–15).    Specifically, it applied for a license to provide intensive outpatient and outpatient treatment at the 8695 College Parkway location.    (Tr. 243:19–25, 396:25–397:2, 438:12–15).

223.    As part of that application, DCF contacted Lee County to determine whether KR had the zoning to provide intensive outpatient and outpatient treatment services at the College Parkway location.    (DX123; Tr. 184:14–22, 186:12–15).

224.    County staff explained that the County issued a certificate of use for the College Parkway location to KR certifying that it had the zoning to provide counseling, therapy, and treatment at that location.    (Tr. 186:16–18; DX123).    The College Parkway property was zoned commercial.    (Tr. 186:22–187:2; DX123).

225.    County staff confirmed to DCF that outpatient substance abuse counseling and outpatient intensive substance abuse counseling was permitted at the College Parkway location.    (Tr. 187:6–9; DX123).    The

County issued a use permit for that purpose on March 25, 2016. (JX101; Tr. 437:20–438:7).

226. As a result, DCF issued a license to provide intensive outpatient and outpatient treatment in unincorporated Lee County at the College Parkway location. (Tr. 243:13–18, 244:1–6). KR later moved to 6209 Corporate Court, which also was zoned commercial. (Tr. 243:24–25, 396:25–397:2). DCF provided a license to KR to provide intensive outpatient and outpatient substance abuse treatment at this location. (Tr. 243:20–25, 438:8–11).

227. The DCF licenses do not permit inpatient treatment. (Tr. 244:7–9).

228. DCF provided its first and probationary certification to KR on August 29, 2016, which expired on November 26, 2016. (Tr. 316:1–11, 438:19–23; JX116; JX117).

229. On November 7, 2016, T. Mouracade sent a letter to DCF requesting an extension on the probationary certification because of a lack of a client base. (Tr. 439:4–9, 440:1–3; JX116). KR did not accept its first patient until December 2016. (SOF ¶ 227).

230. The County also issued a permit on April 25, 2016, authorizing KR to operate a community residential home for up to 14 people at the Winkler Property. (Tr. 185:7–14, 187:14–188:8; DX123).

49

231.    A community residential home would allow up to 14 individuals in recovery to reside at the Winkler Property.  (Tr. 185:15–23).  KR could provide supervision and care by support staff as necessary to meet the physical, emotional, and social needs of the residents.  (Tr. 185:21–186:4; DX123).

232.    With this zoning approval, KR operated a recovery residence for a couple of years at the Winkler Property and was certified by the Florida Association of Recovery Residences ("FARR").  (Tr. 246:6–14, 318:1–5, 385:21–25).  The property was used for several recovery-related activities. (Tr. 385:22).  KR also obtained the highest level of certification that FARR offers to provide sober living services.  (Tr. 385:23–25).

233.    By February 21, 2020, KR's certification with FARR had lapsed. (Tr. 318:16–319:8; JX121).  DCF issued a cease-and-desist letter and sent it to the Mouracades' home address.  (JX121; Tr. 402:8–14).  The letter explained that KR was operating in violation of state law.  (Tr. 402:15–19; JX121).  As a result, KR was required to transfer all the patients at the recovery residence at Winkler Road to another facility because of the lack of certification.  (Tr. 348:7–10, 402:20–403:1; JX121).

234.    At the time, four patients resided at the Winkler Property.  KR complied with this requirement and moved the patients to another FARR-certified facility.  (Tr. 388:3–10, 403:6–25).

235.   DCF allowed KR to have patients at the Winkler Property, but T. Mouracade could not recall when that was permitted.  (Tr. 388:11–17).

236.   On October 2, 2016, KR applied for a DCF license to provide day/night treatment.   (Tr. 243:17–18, 440:22–441:5; JX115).   Under this license, treatment is provided at one location and housing at another.  (Tr. 244:10–13).  "Day/night is the most intense outpatient regimen that you can provide." (Tr. 244:13–14).

237.  The treatment was to be provided at the College Parkway location and housing at the Winkler Property.  (JX115).

238.   This type of substance abuse treatment was within the permitted and current AG-2 zoning.  (JX115; JX123; Tr. 441:18–442:7).

239.   KR's patients are not permitted to drive to or park on the property.  (Tr. 267:2–4).

240.   KR failed to provide the information to complete the application for day/night license.  (JX118; Tr. 441:9–17).

241.   During the COVID-19 pandemic, KR also had the ability to apply for a license to operate a residential treatment facility with up to 14 beds.  (Tr. 388:22–23, 445:4–8).  To obtain approval for more than five beds, KR was required to connect to the County water and sewer.  (Tr. 389:7–11).   T. Mouracade testified that KR did not pursue it because it was only a temporary waiver, and he did not want to invest the time and resources.  (Tr.

389:22–25).  The biggest factor in the decision to withdraw the application was M. Mouracade's unavailability due to her busy schedule.  (Tr. 390:3–8). Martin explained that T. Mouracade withdrew the application because he did not want to connect to the sewer, which was required in the LDC to rezone or develop property.  (Tr. 483:10–15, 612:4–18).

242.    To provide a license for substance abuse treatment, DCF requires that the entity be accredited by the joint commission.  (Tr. 442:8–12).  If an entity is not accredited, the DCF license will be denied.  (Tr. 442:13–15; JX126).

243.    KR did not accept its first patient or provide any treatment services until December 2016.  (Tr. 304:13–16, 397:3–5).

244.    M. Mouracade is a full-time physician owner at Associates in Nephrology.  (Tr. 241:11–13).  She has privileges at all four hospital systems in Lee County.  (Tr. 344:7–15).

245.    The first time M. Mouracade was a medical director involving substance abuse treatment was at KR.  (Tr. 308:23–309:2).  She had no prior experience with substance abuse treatment.  (Tr. 309:3–12).  She had limited knowledge about KR's operations until she became the CEO in May 2021. (Tr. 347:9–14).

246.    T. Mouracade operated KR from 2016 to 2020.  (Tr. 246:18–20). In May 2021, T. Mouracade was no longer able to operate or manage any

facility under DCF license or associated with a DCF license because of a previous criminal arrest and conviction related to substance abuse.[5]  (Tr. 246:20–247:25, 358:1–4, 410:4–411:3, 411:25–412:21).

247.  After T. Mouracade's disqualification, M. Mouracade took over ownership, management, and treatment at KR.  (Tr. 248:3–5).  She is currently the CEO.  (Tr. 302:24-303:4).  She stands to gain financially if the Court enters an injunction.  (Tr. 309:18–23, 349:14–350:1).

248.  T. Mouracade is no longer the CEO and is not a member, director, or officer of KR.  (Tr. 408:8–16).

249.  KR has a license from Florida's Agency for Health Care Administration ("AHCA") for a "five-bed mental health inpatient license."[6] (Tr. 245:8–9).  AHCA does not license substance abuse treatment.[7]  (Tr. 310:9–12).  KR provides these services at the Winkler Property but does not currently have any patients.  It has only ever had two patients who resided there for two weeks in December 2023.  (Tr. 245:10–13, 310:20–311:8).

---

[5] T. Mouracade asserted that he has received a waiver and is able to operate a substance abuse treatment center.  (Tr. 734:10–20).  That said, he provided no documentary evidence in support.  (Tr. 734:16–735:20, 756:16–20).  He asserted that the waiver was not in his custody but admitted that it is in the custody of KR—a party—and was not entered into evidence.  (Tr. 756:19–20, 762:25–763:5).  Additionally, M. Mouracade testified that she remains the sole owner and operator of KR.  (SOF ¶ 279).

[6] The trial transcript incorrectly refers to the AHCA as "ACCA."

[7] Plaintiffs argued that they would be licensed by DCF, not by AHCA.  (Tr. 8:13–14, 13:10–16).

250.    From December 2016 to March 2020, KR treated 100 to 125 individuals, with a majority of them only receiving outpatient treatment at Corporate Court.  (Tr. 312:9–11, 332:1–11).  Yet, in 2017 and 2018, KR only received revenue for three months.  (Tr. 448:22–449:10; DX158).

251.    DCF requires an entity to be financially sound to be licensed. (Tr. 450:9–14).

252.    From March 2020 until December 2023, KR had no patients and no one residing at the Winkler Property.  (Tr. 321:1–8).  The only patients were the two patients in December 2023 who were not receiving substance abuse treatment.  (Tr. 245:10–13, 310:20–311:8).  Since December 2023, KR has treated no patients and had no one residing at the Winkler Property. (*Id*.).  Since the COVID-19 pandemic began, KR has provided no substance abuse treatment at the Winkler Property.  (Tr. 419:24–420:4).

253.    M. Mouracade attributed this circumstance to the COVID-19 pandemic, her busy practice, and a lack of need for outpatient treatment centers.  (Tr. 321:9–322:7, 345:8–346:8).

254.    In 2021, Cathy Claud, acting for KR, contacted DCF and explained that KR had been experiencing a very low patient census, and she was concerned that there would not be enough patients for a joint commission audit.  (Tr. 442:16–25; JX126).

255.    KR currently is not accredited by the joint commission.   (Tr.

443:1–3).   Because it is not accredited, it will not be able to obtain a DCF
license.  (Tr. 443:8–13; JX126).

256.   As of May 2023, KR was no longer licensed by DCF to provide
substance abuse treatment services.    (Tr. 244:18–21, 444:4–7).    Its DCF
license was up for renewal, and it elected not to renew it and let it lapse.  (Tr.
244:18–21).  That decision was made by KR and was unrelated to the zoning
of either property.  (Tr. 444:10–13).

257.   KR no longer provides any services and has no operations at
Corporate Court.    (Tr. 244:18–245:11, 723:3–15).    It no longer provides
intensive outpatient or outpatient substance abuse treatment because it does
not have the license to do so.  (*Id.*).

258.   KR currently has no patients, residents, or operations at the
Winkler Property.  (Tr. 444:23–445:3, 723:16–18).  The County's zoning would
allow it to provide services for up to 14 people.  (Tr. 444:23–445:3).

259.   While KR previously had a website and social media to advertise
its services, M. Mouracade has not seen it recently.  KR has had technical
difficulties with the computer and wireless capabilities at the property, but
M. Mouracade believes the website is active.  (Tr. 443:25–444:3, 748:15–23).

260.   KR has never filed a tax return, despite receiving revenue and
income.  (Tr. 447:5–7, 725:20–25; DX158).

55

## KR's Use of the Winkler Property

261.  Plaintiffs currently can use the Winkler Property as a 14-bed residence for community living.  (Tr. 696:6–9).

262.  It has the ability for individuals in recovery to reside together and use that property.  (Tr. 696:10–13).

263.  Plaintiffs admit that they have the same use of the Winkler Property as the Burts.  (Tr. 588:8–11).  Martin further conceded that all the uses permitted for the Winkler Property are the same uses permitted for the other lots in Cold Saturday Farms.  (Tr. 642:6–9).

264.  Plaintiffs also admit that they have used the Winkler Property as a residential home for people who suffer from substance abuse disorders.  (Tr. 597:22–598:4).

## DTC As Property Owner

265.  DTC is the current title holder of the Winkler Property.  (Tr. 384:20–22, 747:19–22).

266.  It entered into a lease agreement with KR on October 1, 2017.  (Tr. 384:23–25, 433:15–25; JX103).  Before that date, it had no agreement to lease the property, despite purchasing it on November 16, 2015.  (Tr. 433:15–25).

267.  The lease permits KR to provide housing or other services in

56

accordance with the zoning.  (Tr. 385:3–6).

268.   KR was obligated to pay DTC $96,000 per year ($8,000 per month) in rent.  (Tr. 434:1–4; JX103).  KR has paid no rent to DTC, even though the lease agreement is still in effect.  (Tr. 385:1–2, 434:20–435:1).  DTC never acted to enforce the terms of the lease agreement.  (Tr. 435:2–18).  It did not evict KR, seek to invoke the default provisions of the lease, or terminate the lease.  (*Id.*).

269.   DTC has not rented the property to any other entity.   (Tr. 435:19–22).  It has not advertised the property for rent.  (Tr. 435:23–25).

270.   DTC has never filed a tax return, even though it received revenue and income.  (Tr. 447:8–11, 725:20–25; DX158).

271.   The only business that DTC operates is that it owns the Winkler Property.  (Tr. 747:19–748:14).  Plaintiffs did not prove that DTC has a local business tax receipt to operate a business in Lee County.  (Tr. 748:12–14).

### Martin's Testimony Regarding Discrimination

272.   Through Martin, Plaintiffs admit that they have no complaints about any County employee or staff member.[8]  (Tr. 579:6–8).

---

[8] At her deposition, Martin was designated as Plaintiffs' corporate representative. Yet Plaintiffs did not designate Martin as a corporate representative at trial.  In any case, when the County cross-examined Martin about her role as corporate representative of KR, Plaintiffs did not object.  Nor did they clarify in what capacity she was testifying at trial—

273.    Through Martin, Plaintiffs admit that none of the commissioners made any discriminatory remarks.  (Tr. 579:9–11).

274.    Through Martin, Plaintiffs admit that the Board concluded that the proposed development did not comply with Policy 5.1.5.  (Tr. 580:7–11).

275.    Through Martin, they also admit that the Board's reasons for the denial are set forth in its resolution.  (Tr. 580:19–22).

276.    Through Martin, Plaintiffs admit that they had no basis to dispute that those reasons were why the Board denied the rezoning application.  (Tr. 584:14–586:22).  Plaintiffs only have a subjective belief. (*Id*.).

## Plaintiffs Seek Judicial Review

277.    On May 16, 2016, Plaintiffs filed a petition for writ of certiorari in the Circuit Court of the Twentieth Judicial Circuit in and for Lee County, Florida, seeking to overturn the Board's zoning decision and declare that its actions violated the ADA.  (JX88:000530–000534, 000577).  Specifically, Plaintiffs argued that the Board departed from the essential requirements of law, including federal law, when they denied the rezoning request.  (*Id*.:

---

fact witness, expert witness, or corporate representative.  Under these circumstances, the Court reasonably infers that Martin continued to be held out as Plaintiffs' corporate representative at trial and testified on their behalf.

000533, 000548, 000577).   Plaintiffs also alleged that the Board's decision was not supported by substantial, competent evidence and Plaintiffs were denied due process.   (*Id*.:000534).   Finally, Plaintiffs alleged that the Board denied the rezoning petition because of community opposition to qualified individuals with disabilities.   (*Id*.; JX 094:000678).   Plaintiffs also asserted that they had standing to challenge the adverse quasi-judicial zoning decision under the ADA as an entity that provides services to individuals with disabilities.  (JX88:000534).

278.   Plaintiffs' brief was filed on May 16, 2016. (*Id*.:000578).   At that time, they had not yet provided any services to any patients.  (Tr. 311:18–21). KR did not take in its first patient until December 2016.   (*Id*.).   And DTC does not treat any patients for substance use disorders.   (Trial Transcript Vol. II: 332:24–333:1; Trial Transcript Vol. II: 416:23–417:5; KR (CC) 55:4–8).

279.   On August 10, 2017, the state circuit court denied the petition, upholding the Board's decision and finding the decision and each of its reasons were supported by substantial competent evidence and the law.  (JX 094:000662–000679).   The court found that the Board's decision was not motivated by unlawful discriminatory animus, but was supported by several legitimate reasons, and the Board's decision did not violate the law, including the ADA.  (*Id*.:000673, 000678).

## Plaintiffs' Letter to the County

280. On June 10, 2016, Plaintiffs' counsel sent a letter to County staff requesting that it allow Plaintiffs' proposed use in AG-2 or rezone the Winkler Property. (JX 085:000579, 000585; Tr. 588:12–21).

281. This was the only letter sent to the County making any type of accommodation request. (Tr. 588:22–589:14).

282. No request for rezoning was made at that time. (Tr. 215:6–9). The letter was only addressed and sent to County staff. (JX82). No application was submitted for rezoning at that time. (PTS ¶ 2). No request was made to the Board. (*Id*.).

283. The county attorney responded to this letter by denying the relief sought and explaining the basis for its decision, including the Board's conclusion that this request would fundamentally alter the zoning scheme, and that Plaintiffs were seeking preferential, not equal, treatment. (JX86).

## Plaintiffs Seek Judicial Review in the
## Second District Court of Appeal

284. On September 19, 2017, Plaintiffs sought second-level appellate review in the Florida Second District Court of Appeal ("Second DCA"). (JX95). Plaintiffs again sought to overturn the Board's decision and declare that it violated the ADA. (*Id*.:004106, 004110, 004137-4139, 004151, 004153; JX99:004212, 004215, 004223; JX73:004212, 004215, 004223). They argued

that the circuit court departed from the essential requirements of law when it failed to find a violation of the ADA. (JX095:004128–004129; JX099:004209, 004211, 004222–004224).

285. The Second DCA rejected these arguments and denied the petition, upholding the circuit court's order and concluding that there was no violation of law. (JX100).

286. More than a year after the Second DCA's decision and four days before the statute of limitations expired, Plaintiffs filed this action, asserting one count under the ADA against the County challenging the Board's August 5, 2015, decision. (Doc. 1 ¶ 3).

287. While Plaintiffs identified injunctive relief as one of the remedies, in the last four years, Plaintiffs have taken no action to seek a preliminary injunction, nor have they filed any application to rezone the Winkler Property. (Tr. 215:6–9, 592:9–14).

## CONCLUSIONS OF LAW

First, the Court addresses the threshold legal issues of standing, res judicata, and collateral estoppel. Next, the Court rules on the County's Rule 702 motion to exclude Martin and M. Mouracade as experts and makes

certain credibility findings.[9]  Finally, the Court determines whether Plaintiffs have proven by a preponderance of the evidence that the County intentionally discriminated against or failed to accommodate them under the ADA.

## Standing

Defendant argues that Plaintiffs lack standing.  (Doc. 224 at 62–69). Defendant raised this argument at the motion to dismiss and summary judgment stages of this case.  Both times, the Court foreclosed it.  (Doc. 45 at 11–17; Doc. 183 at 6–9).  The Court maintains its ruling on this issue and declines to reiterate it here.  Accordingly, the Court finds that Plaintiffs have standing to bring their ADA claims.

## Res Judicata and Collateral Estoppel

Defendant argues that res judicata and collateral estoppel bar Plaintiffs' claims.  (Doc. 224 at 78–83).  Defendant raised these arguments at the motion to dismiss and summary judgment stages of this case.  Both times, the Court foreclosed these arguments.  (Doc. 45 at 17–18; Doc. 183 at 10–12).  The Court maintains its ruling on these issues and declines to reiterate it here.  Accordingly, the Court finds that res judicata and collateral

---

[9] The County did not file a separate Rule 702 motion, but the Court construes its argument that the Court must exclude Martin and M. Mouracade's opinions under Rule 702 as a renewal of its *Daubert* motions.

estoppel do not bar Plaintiffs' claims.

## Expert Witnesses

Before reaching the merits of the discrimination claims, the Court addresses expert witness issues and makes credibility findings. First, the Court analyzes whether to exclude the expert opinions of Martin and M. Mouracade. Under Federal Rule of Evidence 702,

> [a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

As gatekeeper, a court makes three inquiries: (1) whether the expert is qualified to testify competently regarding the matters that he or she intends to address; (2) whether the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) whether the testimony will assist the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562–63 (11th Cir. 1998). The party offering the expert bears the burden to establish the expert's qualification, reliability, and helpfulness by a preponderance of the evidence. *Kilpatrick v.*

63

*Breg, Inc.*, 613 F.3d 1329, 1335 (11th Cir. 2010).

Generally, the Eleventh Circuit's *Daubert* standard is flexible and affords broad latitude to the trial court. *Horrillo v. Cook Inc.*, No. 08-60931-CIV, 2014 WL 2708498, *2–3 (S.D. Fla. June 6, 2014), *aff'd* 664 F. App'x 874 (11th Cir. 2016). Moreover, a district judge presiding over a bench trial "enjoys extremely broad discretion to admit expert testimony because there are no longer concerns about 'dumping a barrage of questionable scientific evidence on a jury.'" *Exim Brickell, LLC v. Bariven, S.A.*, CASE NO. 09-CV-20915-GOLD/McALILEY, 2011 WL 13131317, *2 (S.D. Fla. Mar. 11, 2011) (quoting *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1310 (11th Cir. 1999)). In a bench trial, "traditional concerns involved with introducing expert testimony based on disputed factual assumptions during a jury trial are greatly reduced." *Id.* at *4.

During the motion practice phase of this case, the County moved to exclude M. Mouracade and Martin as experts, arguing they have no specialized knowledge. It argued that Martin would usurp the Court's role by stating legal conclusions on reasonable accommodations and zoning regulations. And the County contended that both experts used flawed methodology. (Doc. 148). The undersigned denied the motion, reasoning that the County's concerns were "more appropriately discussed at trial when all the facts [could] be considered." (Doc. 183 at 19).

Before trial, Plaintiffs identified M. Mouracade and Martin as experts on their witness list. (Doc. 198-6). But at trial, Plaintiffs inexplicably tendered neither witness as an expert or ask the Court to accept either one as an expert on a particular subject. (Tr. 237–93, 471–546). Now, the County again moves to exclude their expert opinions. (Doc. 224 at 61–62). It asserts that both witnesses lack the knowledge, skill, experience, training, and education to testify as an expert witness. (Doc. 224 at 61).

As to Martin, the County argues that she lacked "relevant and substantial expertise regarding the Lee County LDC or Lee Plan." (Doc. 224 at 62 (citing Tr. 599:19–600:7, 600:8–10, 600:11–13, 600:19–21, 605:3–20, 619:8–10, 619:25–620:3, 620:7–9, 638:18–23, 651:11–16)). The County also argues that Martin's opinion about the need for treatment should be excluded. At trial, Martin admitted her opinion was limited to helping one friend and was unaware of his treatment plan. (Tr. 566:13–567:2, 567:12–14). She also admitted she has no legal training, medical training, or relevant knowledge, education, or experience. (Tr. 605:3–8, 605:9–19, 605:20–22).

As to M. Mouracade, the County emphasizes that she conducted no research in the need for treatment services in Lee County. (Tr. 251:4–9). Rather, data was "presented" to her. (Tr. 251:4–8). She relied on studies that she read, but they contained no data regarding Lee County or

individuals who could not get treatment because facilities were scarce. (Tr. 294:16–18; 326:20–24). So the County argues the Court should also exclude her opinions.

It is indisputable that Plaintiffs tendered neither witness as an expert or asked the Court to recognize them as an expert on a particular subject. With this approach, Plaintiffs deprived the County of notice that the witness would be testifying as an expert under Rule 702. Even so, the Court finds that all these deficiencies go to the weight, not the admissibility, of their testimony.

Most importantly, the Court presided over a bench trial. With this format comes broad judicial discretion concerning expert testimony. Further, the Court and the County are deeply familiar with this case. The County previously moved to exclude these two witnesses' expert opinions. (Doc. 148). Accordingly, the undersigned and the County were well-positioned to understand the significance of Martin and M. Mouracade's testimony— despite never explicitly being told it was "expert" in nature.

Turning to the individual witnesses. Lee County has recognized Martin as an expert in the LDC and the Lee Plan. (Tr. 474:4–12). She has testified before the Lee County hearing examiner around 40 to 50 times since 2006. (Tr. 476:12–477:19). And in the local proceedings related to this case, the hearing examiner accepted Martin as an expert. (Tr. 476:12–477:19).

Thus, the Court finds that Martin is an expert in planning—specifically the LDC and the Lee Plan—in this case.

M. Mouracade is another story. Even Plaintiffs' proposed FFCL do not describe M. Mouracade as an expert. (Doc. 223). At trial, Plaintiffs elicited testimony about M. Mouracade's education, board certifications, and professional experience. The Court has no reason to doubt M. Mouracade's capabilities as a practicing physician or that she is well-versed in addiction medicine and treating individuals with substance abuse disorders. But Plaintiffs provided the Court with no guidance in the specific field they wanted M. Mouracade declared an expert. In truth, the Court left the bench wondering whether Plaintiffs themselves considered M. Mouracade an expert under Rule 702 or could identify her area of expertise. Nevertheless, having heard the evidence, the Court accepts M. Mouracade as an expert in *treating* patients regarding internal medicine and addiction medicine. (Tr. 239:22–240:4).

But whether she is qualified to provide expert testimony about the *need* for the requested accommodation is another matter. The Court does not doubt that M. Mouracade is qualified, for example, to diagnose individuals with substance abuse disorders, prescribe them medicine, and otherwise treat such individuals. And as a physician with some focus on addiction medicine, M. Mouracade might have a medical opinion on whether there is a

"need" for the accommodation, in the colloquial sense of the word. But M. Mouracade conceded that she has conducted no research on the need for the accommodation. (Tr. 251:4-9). She merely relied on dated studies conducted by others that she simply read. (Tr. 294:16-18). The Court sees no evidence that she has the required knowledge or training to offer expert opinions on whether the accommodation is necessary. Accordingly, the Court excludes M. Mouracade's expert opinions about whether the requested accommodation is necessary.

## Credibility Findings

"It is within the exclusive province of the judge in non-jury trials to assess the credibility of witnesses and assign weight to their testimony." *D&M Carriers LLC v. M/V Thor Spirit*, 586 F. App'x 564, 568 (11th Cir. 2014) (quoting *Hearn v. McKay*, 603 F.3d 897, 904 (11th Cir. 2010)). A judge is "free to choose among alternative reasonable interpretations of the evidence." *Id*. The Court makes the following credibility findings.

Although the Court accepts Martin as a planning expert, it finds her opinions here have little to no credibility. Simply put, Martin is too close to this case. During discovery, she was deposed as a corporate representative for KR and DTC. (Tr. 568:19–570:8). She also consented to testifying as the corporate representative on behalf of KR. (Tr. 569:19–23). She was paid for both depositions and her trial testimony. (Tr. 570:9–571:7).

At trial, Martin repeatedly referred to T. Mouracade as "Tom," indicating deep familiarity. (Tr. 486:7, 487:13). Martin testified that the Mouracades are not only her clients, but her friends—a "personal friendship" that developed "over the course of . . . years." (Tr. 487:12–20; 592:6–8). These facts combined severely undermine Martin's credibility.

M. Mouracade's credibility is even more suspect. First, there is her personal relationship to the case. For 16 years, she has been married to T. Mouracade, the visionary behind KR and sole owner and managing member of DTC, which owns the Winkler Property. (Tr. 280:21–23, 394:22–24; Tr. 384:20–22).

That's not all. There is also M. Mouracade's financial relationship to the case. After T. Mouracade's disqualification, M. Mouracade took over ownership, management, and treatment at KR. (Tr. 248:3–5). She serves as the company's CEO. (Tr. 302:24–303:4). If the Court orders the Winkler Property to be rezoned, she stands to gain financially. (Tr. 309:18–23). Given these facts, the Court finds that M. Mouracade's testimony has little to no credibility.

Finally, T. Mouracade. Although he offered no expert testimony, the Court finds it necessary to explain why he, too, lacks credibility. T. Mouracade suffers from memory and processing issues. (Tr. 359:7–15). The Court does not hold those issues against him or consider them in assessing

his credibility. That said, throughout his testimony, he balked at answering questions even though the answers were often written on the exhibit presented to him on cross-examination. (*See, e.g.*, Tr. 405:10–21, 409:2–7, 411:2–14, 427:4–429:5). His refusal to clearly answer questions required frequent impeachment and recollection refreshing, which muddled his testimony almost beyond comprehension. When he finally answered questions, his answers were regularly evasive, convenient, and selective. In the Court's view, his approach to answering questions thoroughly undermined his credibility.

### Intentional Discrimination (Disparate Treatment)

Plaintiffs allege that Defendant's denial of their zoning application constitutes intentional discrimination under Title II of the ADA. To prove that a zoning decision was based on intentional discrimination, a plaintiff must show that a defendant intended to discriminate or was improperly motivated in making the discriminatory decision. *Palm Partners, LLC v. City of Oakland Park*, 102 F. Supp. 3d 1334, 1342 (S.D. Fla. 2015) (citing *Bonasera v. City of Norcross*, 342 F. App'x 581, 584 (11th Cir. 2009)). A plaintiff may establish discriminatory intent through either direct or circumstantial evidence. *Id.* (citing *Caron Found. of Fla., Inc. v. City of Delray Beach*, 879 F. Supp. 2d 1353, 1368 (S.D. Fla. 2012)).

*Direct Evidence of Intentional Discrimination*

Direct proof of discriminatory animus involves "evidence, which if believed, proves existence of [the] fact in issue without inference or presumption." *Sailboat Bend Sober Living, LLC v. City of Fort Lauderdale, Fla.*, 46 F.4th 1268, 1281 (11th Cir. 2022) (quoting *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1528 n.6 (11th Cir. 1987)). For example, if a city official "makes discriminatory comments about the disabled while explaining his basis for the contested decision, that is direct evidence of discrimination." *Id.* (quoting *Cinnamon Hills Youth Crisis Ctr., Inc. v. St. George City*, 685 F.3d 917, 920 (10th Cir. 2012)). If a plaintiff establishes intentional discrimination through direct evidence, the inquiry ends there, and the plaintiff is entitled to relief. *Palm Partners*, 102 F. Supp. 3d at 1342 (citing *Massaro v. Mainlands Section 1 & 2 Civic Ass'n, Inc.*, 3 F.3d 1472, 1476 n.6 (11th Cir. 1993)). But rarely will a plaintiff make a case based on direct evidence. *Id.* (citation omitted).

The Court finds no direct evidence showing that the Board intentionally discriminated against Plaintiffs in denying the application to rezone the Winkler Property. As an initial matter, Plaintiffs' argument related to direct evidence of discrimination is all over the map. This seemingly stems from the fact that at various points in this case, Plaintiffs conflated the terms "intentional," "actual," and "direct" in connection with

71

their intentional discrimination claim.

For instance, Plaintiffs' counsel told the Court at trial he had no direct evidence of discrimination by the Board. (Tr. 779:6–8). The Court asked, "[s]o you're telling me no direct evidence at this point, but you feel that the circumstantial evidence of, I believe you talked about Mr. Manning's comments at the beginning, those things you're using as circumstantial evidence of discrimination[?]" (Tr. 779:17–21). Plaintiffs' counsel answered, "yes." (Tr. 779:22). Moments later, he reversed course, quoting appraiser Woody Hanson's hearing testimony and arguing, "I think that that could constitute direct evidence." (Tr. 780:16–17). Plaintiffs' counsel also vaguely referred to "other evidence voiced by the commissioners that this . . . will create crime or . . . these treatment facilities are associated with increased criminal activity." (Tr. 780:18–21). He asserted that that is "pretty close, if not actually, direct evidence." (Tr. 780:23–24). In the Court's view, Plaintiffs' equivocation shows that their own counsel is unsure what is direct versus circumstantial evidence here.

Now, in their proposed FFCL, Plaintiffs contend in a conclusory manner that "there is . . . direct . . . evidence that the County acted with discriminatory intent." (Doc. 223 at 61). Based on their proposed FFCL, it remains unclear precisely what direct evidence supports Plaintiffs' argument or whether they are still pursuing a theory of direct evidence of

72

discrimination.[10]

Even ignoring Plaintiffs' muddled argument, the Court finds no direct evidence in the record that the County intentionally discriminated against Plaintiffs in denying their application. Hanson is not a member of the Board and did not vote on Plaintiffs' zoning application, so his statements bring nothing to the table. Further, Martin, who was Plaintiffs' corporate representative and testified at her deposition on behalf of KR, admitted that none of the commissioners made any discriminatory remarks at the hearing. (Tr. 568:9–21; 579:9–25). In the Resolution of the Board of County Commissioners of Lee County, Florida, the Board stated that it denied the application because KR "has not proven entitlement to the Request as the proposed plan of development does not comply with Lee Plan Policy 5.1.5." (JX82). The Board wrote:

> that the Request is potentially destructive to the character and integrity of the residential neighborhood environment and therefore does not meet the objective of Policy 5.1.5 of the Lee Plan for the following reasons:
>
> a.   it would result in the encroachment of commercial uses into an existing residential area;
>
> b.   it is incompatible with and not an acceptable

---

[10] The part of their proposed FFCL devoted to intentional discrimination only includes a section for circumstantial evidence and does not mention direct evidence. (Doc. 223 at 85–89).

    transition into the current low density
    residential area to the south;

  c. it is not consistent with the surrounding land
    uses;

  d. it will result in a decrease in appraised
    property values for surrounding properties;

  e. the uses requested are not similar to and do
    not already exist in the surrounding area;

  f. it will not have a positive or neutral impact
    on the surrounding community; and

  g. no adequate conditions can be devised to
    address the potential impacts of the proposed
    Request on the surrounding residential
    neighborhoods.

(JX82). This rationale is consistent with the hearing transcript, which shows that the Board's decision rested on the evidence, not the public's comments.

Rather than demonstrate direct evidence of discrimination, the record shows the opposite. The record is devoid of any commissioner making "discriminatory comments about the disabled while explaining his basis for the contested decision." *See Sailboat Bend Sober Living, LLC v. City of Fort Lauderdale*, 479 F. Supp. 3d 1298, 1328 (S.D. Fla. 2020), (finding no direct evidence of discrimination), *aff'd sub nom. Sailboat Bend Sober Living,* 46 F.4th 1268 (quoting *Cinnamon Hills*, 685 F.3d at 919 (Gorsuch, J.) (cleaned up)); *Palm Partners*, 102 F. Supp. 3d at 1343 (same). Commissioner Mann expressly stated that he did not agree with the public's arguably

discriminatory comments and emphasized that he served on the board of a nonprofit that provided substance abuse treatment. Commissioner Hamman underscored that the Board does not make decisions based on applause. (JX80:3483). Commissioner Kiker reminded the parties to focus on the legal points because that is how the decision is made.[11] (JX80:3443).

In sum, the Court sees no direct evidence of discrimination by the Board. Without any direct evidence, Plaintiffs must establish their intentional discrimination claim through circumstantial evidence. *Palm Partners*, 102 F. Supp. 3d at 1342.

### Circumstantial Evidence of Intentional Discrimination

The Court also finds that Plaintiffs failed to prove intentional discrimination through circumstantial evidence.[12] A court analyzes a claim of intentional discrimination based on circumstantial evidence using the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*,

---

[11] The Court acknowledges that the commissioners made statements that give Plaintiffs pause, including Commissioner Manning announcing at the beginning of the hearing that he would produce substantial evidence adverse to the application and would move to deny it. (JX80 at 11:25, 12:1–2, 17:12–16; Tr. 557). Additionally, Commissioner Manning said he could not remember the Board denying a zoning request like Plaintiffs' request, "except one time when it cost us eight million dollars." (JX80 at 9:20–21). But the Court finds that these statements are not direct evidence of discrimination on the basis of disability.

[12] Plaintiffs rely on and quote the Court's order denying summary judgment, in which the Court found that Plaintiffs "presented enough circumstantial evidence of intentional discrimination to survive summary judgment." (Doc. 223 at 64 (quoting Doc. 183 at 14)). Having heard the evidence at trial, the Court now concludes that Plaintiffs failed to establish a prima facie case of intentional discrimination.

411 U.S. 792 (1973). *See, e.g., Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1255 (11th Cir.2007) (citation omitted). Under that framework, the plaintiff has the burden of proving a prima facie case of discrimination by a preponderance of the evidence. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53 (1981). In assessing whether a plaintiff has established a prima facie case of discrimination, a court employs the factors set out in *Village of Arlington Heights v. Metropolitan Housing Development Corporation*, 429 U.S. 252, 266 (1977). Among these are: (1) "discriminatory or segregative effect"; (2) "historical background"; (3) "the sequence of events leading up to the challenged actions"; and (4) "whether there were any departures from normal or substantive criteria." *Hallmark Devs., Inc. v. Fulton Cnty., Ga.*, 466 F.3d 1276, 1283 (11th Cir. 2006). Additional factors that may be probative of whether discriminatory intent motivated a decision-making body include: "legislative or administrative history, especially where there are contemporary statements by members of the decision-making body, minutes of its meetings, or reports, foreseeability of discriminatory impact, knowledge of discriminatory impact, and the availability of less discriminatory alternatives."[13] (Doc. 183 at 14–15 (cleaned up) (citing *Thai*

---

[13] The parties analyze some, but not all, of these factors in their proposed FFCL. (Docs. 223, 224). Although the Court does not explicitly analyze each factor, it has carefully

*Meditation Ass'n of Ala., Inc. v. City of Mobile, Ala.*, No. 1:16-CV-395-TFM-
MU, 2019 WL 2250275, at *12–13 (S.D. Ala. May 24, 2019), *aff'd,* 980 F.3d
821 (11th Cir. 2020))).

If the plaintiff sufficiently establishes a prima facie case, "the burden
shifts to the defendant to articulate some legitimate, nondiscriminatory
reason for its action." *Sec'y, U.S. Dep't of Hous. & Urb. Dev., on Behalf of
Herron v. Blackwell*, 908 F.2d 864, 870 (11th Cir. 1990) (citation and internal
quotation marks omitted). "[I]f the defendant satisfies this burden, the
plaintiff has the opportunity to prove by a preponderance [of the evidence]
that the legitimate reasons asserted by the defendant are in fact mere
pretext." *Id.*

Plaintiffs' case doesn't get off the ground. Applying the factors set forth
in *Village of Arlington Heights*, the Court finds that Plaintiffs fail to establish
a prima facie case of intentional discrimination. First, there is no indication
that the Board's decision to deny the application had a discriminatory effect.
Plaintiffs cite no evidence of the decision's effect in their proposed FFCL.
Rather, they state in a conclusory manner that "the discriminatory effect is
obvious. 72 people in need of residential treatment are being denied." (Doc.

---

considered them all.

223 at 87). While they characterize the discriminatory effect as "obvious," they identify no evidence in the record, such as statistics, data, or other information, showing any sort of disparate effect. *See Palm Partners*, 102 F. Supp. 3d at 1344 (finding no evidence that the City's decision to deny rezoning application had discriminatory effect). No "clear pattern, unexplainable on grounds other than [disability]," has emerged from the effect of the Board's action. *Arlington Heights*, 429 U.S. at 266. As a result, the Court cannot find evidence that the Board's decision bears more heavily on the disabled than the non-disabled. *See Palm Partners*, 102 F. Supp. 3d at 1344.

Second, the Board's decision's historical background does not reveal a series of official acts taken for invidious purposes. *Id.* at 1345. Plaintiffs identify only one other instance where the Board purportedly made a zoning decision "like this," that ultimately cost "eight million dollars."[14] (Doc. 223 at 87; JX80:3441). But Plaintiffs offer no context or details surrounding that other decision. Without more, the Court cannot determine that the Board's other decision was discriminatory. And even if Plaintiffs had introduced

---

[14] Plaintiffs note that the hearing transcript may have incorrectly attributed this statement to Commissioner Manning, when in fact Commissioner Mann made the statement. (Doc. 223 at 28 n.17). This is a moot point. The Court has considered the hearing transcript and still finds that the commissioners' statements (no matter who said them) do not show discriminatory animus by a majority of the Board by a preponderance of the evidence.

additional details about this other decision, the Court doubts that just one other case would suffice to show by a preponderance of the evidence a "series of official acts taken for invidious purposes." *Palm Partners*, 102 F. Supp. 3d at 1345. In the Court's view, one or two is not a series. In any event, Plaintiffs have given the Court no reason to question the Board's decision based on its historical background. *See id.*

Third, nothing in the sequence of events leading up to the decision suggests discriminatory intent. As evidence of intentional discrimination, Plaintiffs underscore: the commissioners' statements at the hearing, which Plaintiffs characterize as "pre-judging"; the organization of a PAC in opposition to their zoning application; and the purportedly hostile and discriminatory "not in my backyard" statements from the community, and open hostility to a residential treatment facility for people with substance use disorders. (Doc. 223 at 88).

Plaintiffs' burden is to show that the County acted with discriminatory animus. *See Matthews v. Columbia Cnty.*, 294 F.3d 1294, 1297 (11th Cir. 2002) ("Because policymaking authority rests with the Commission as an entity, the County can be subject to liability only if the Commission itself acted with an unconstitutional motive."). To do so, they must show that a majority of the commissioners had a discriminatory motive in denying the rezoning application. *See Mason v. Vill. of El Portal*, 240 F.3d 1337, 1340

(11th Cir. 2001); *see also Bates v. Islamorada, Vill. of Islands*, 243 F. App'x 494, 496 (11th Cir. 2007). It is insufficient to show that one member of a board acted with an improper motive. *See Rolle v. Worth Cnty. Sch. Dist.*, 128 F. App'x 731, 733 (11th Cir. 2005).

Plaintiffs highlight these statements that the commissioners made at the hearing as circumstantial evidence of discrimination:

> Commissioners Kiker and Manning announced that they would be producing substantial evidence adverse to the application, *id.* at 11:25, 12:1-2, 17:12-16, and would make a motion to deny the application;
>
> At the conclusion of the rebuttal, Kimberly's lawyer requested that Commissioner Manning provide due process by stating for the record the basis of his announced opposition so that Kimberly could have an opportunity to respond, *id.* at 90:19-22, and was advised by Manning that he would give Kimberly his reasons for opposing the application after it completed its presentation, thus depriving Kimberly of the opportunity to respond; and
>
> One commissioner said, "[W]hen my time comes to speak I will put evidence into the record that will hopefully gather votes to deny this application." (Doc. 157-10 at 18:12-16).

(Doc. 223 at 87–88). Plaintiffs also note Commissioner Manning asked the county attorney what the Board needed to do to make a decision to deny the application hold.[15] (*Id.*). He asked "what type of circumstances would be

---

[15] The Court understands that for support, Plaintiffs rely on the summary judgment order, which allowed Plaintiffs to present evidence of discriminatory impact at trial because

necessary for the opponent to demonstrate, which would give us the flexibility of a decision other than approval." (JX80:3440).

Plaintiffs argue these statements show "pre-judging by at least two of the five commissioners." (Doc. 223 at 88). There is no dispute that the commissioners made these statements. Instead, the County argues that they simply do not show that the Board or a majority of the commissioners acted with discriminatory animus. (Doc. 224 at 88).

Having reviewed not only these statements but also the entire transcript of the Board's hearing, the Court agrees with the County. And even Plaintiffs admit that this evidence only allegedly shows pre-judging "by at least two of the five commissioners"—not a majority of the Board, as the Eleventh Circuit requires. (Doc. 223 at 88). In any event, the commissioners' statements do not show discriminatory animus.

In fact, Commissioner Manning clarified his "broader intent," which was for opponents of the application and their attorneys to "not waste their time talking about—I just don't like this project in my neighborhood—to deal

---

it was "reasonable the Board suspected a discriminatory impact by denying rezoning because they asked their attorney what they needed to do to make their decision hold." (Doc. 223 at 87–88 (quoting Doc. 183 at 15)). But now the Court has heard the evidence at trial and finds that despite the commissioners' statements, Plaintiffs did not show by a preponderance of the evidence that the Board had a discriminatory animus in denying the application.

with specific legal points that would give us a basis for a decision other than approval." (JX80:3443). Simply because the commissioners opposed Plaintiffs' application does not mean that discrimination against individuals recovering from substance use disorders motivated their opposition. Commissioner Manning's remarks, for example, show that he wanted to hear reasons other than discriminatory ones to deny the application.

Similarly, the transcript shows that at the outset of the hearing, Commissioners Kiker and Pendergrass focused on how the application violated Policy 5.1.5 as a basis for denial, not that KR wanted to serve individuals with substance abuse issues. (JX80:3444 (Commissioner Kiker remarked on a "specific policy [5.1.5] that coincides with this request" and Commissioner Pendergrass noted that the Board "can't under that 5.[1].5 based on competent and substantial evidence. If we can find conclusions to that, we can use that as evidence against it.")).

Plaintiffs also argue that neighbors' campaign contributions to some commissioners constitutes circumstantial evidence of discrimination. They emphasize that opponents of their application hired local lawyer Sawyer Smith and contributed over $200,000 to the Protect Our Community PAC to support politicians opposed to the application. (Doc. 223 at 26; JX75). But Plaintiffs do not show that Smith made any discriminatory remarks. Evidence about the PAC does not show it was formed to oppose Plaintiffs'

rezoning request or commissioners who voted for rezoning. And Plaintiffs do not point to evidence that the commissioners knew about the PAC. Plaintiffs' argument that the PAC and contributions are circumstantial evidence of intentional discrimination is smoke and mirrors.

The County argues that Plaintiffs did not adduce evidence of the specific contributions. (Doc. 224 at 89). But Joint Exhibit 75 lists four individuals or entities who contributed between $40,000 and $50,000 to the PAC in 2015—Leslie Feiock, Wallace Burt, Thomas Burt, and Barnes Family Chiropractic Clinic. (JX75). At any rate, Plaintiffs did not show why the donors made these contributions, that the commissioners received any money, or that the commissioners knew about the contributions or why they were made when the Board voted on Plaintiffs' application. Plaintiffs pinpoint no evidence demonstrating that any political contributions led to the Board denying their application because KR's residents would be individuals with substance use disorders. There is only Plaintiffs' speculation. That is not enough.

Plaintiffs also state that Cold Saturday Farms residents Thomas and Nina Burt, represented by Smith, tried to prevent DTC from purchasing the Winkler Property by filing a lawsuit and a notice of *lis pendens* on the property. (Tr. 382–84; PX11). Plaintiffs state that the court eventually dismissed the lawsuit and imposed sanctions of over $500,000 on the Burts

and their lawyers.  But this lawsuit is not evidence that discriminatory animus motivated the Board's denial of the zoning application.  Specifically, Plaintiffs do not identify evidence that the commissioners knew about or were involved in the lawsuit or judgment.  Their argument is more conjecture.

Nothing suggests that the Board's decision resulted from the community's hostile opposition to the facility.  A sampling of the objectors' comments includes:

> Everybody on this street is raising children. What's more important than that?  I can guarantee you, not pigs.  JX 48, (HEX 1 Tr.) at 408:25,409:1–3.

> As a mother of two small children, I am absolutely not willing to risk the safety of my children.  Would you?  *Id.* at 428:23, 429:1–2.

> So you can sit here and talk all you want about let's put a drug rehab center in our neighborhood.  Wrong answer. You put a drug center out away from children.  *Id.* at 463:22-25.

(Doc. 223 at 24–25).

A plaintiff may demonstrate intentional discrimination if the "decision-making body acted for the sole purpose of effectuating the desires of private citizens, that [discriminatory] considerations were a motivating factor behind those desires, and that members of the decision-making body were aware of the motivations of the private citizens."  *Hallmark*, 466 F.3d at 1283–84 (citations omitted).

Having reviewed the hearing transcript and heard the evidence at trial,

the Court finds that the citizens' remarks—even those discussing a potential
spike in crime associated with residents of a facility like KR—are not
sufficient circumstantial evidence of discrimination.  While the Board was
aware of the potentially discriminatory motives of certain members of the
community, the record does not show the Board acted solely to effectuate
those desires.  Public opposition alone is not enough to establish
discriminatory intent of the Board.  As Palermo testified, the citizens'
comments supporting and opposing the application are "democracy."  (Tr.
46:12–14).  Moreover, some people opposed rezoning for non-discriminatory
reasons, such as the intensity of the development, the proposed commercial
uses, and the proposed changes in use.  For instance, one citizen observed,
"This [is] an intense and invasive commercial use.  I'll tell you why here.
Money."  (Doc. 223 at 25 (quoting JX48:381:18)).  And Plaintiffs concede that
some citizens expressed positive comments about the application.   (Tr.
578:10–13).

The record does not reflect that the Board agreed with or adopted the
public's discriminatory remarks.  *See Metro. Hous. Dev. Corp. v. Vill. of
Arlington Heights*, 558 F.2d 1283, 1292 (7th Cir. 1977) ("The bigoted
comments of a few citizens, even those with power, should not invalidate
action which in fact has a legitimate basis.").  In fact, Commissioner Mann
said he "did not share the concern of some of the residents and neighbors that

85

spoke that they are worried about these people going crazy or being a threat

or danger." (JX80:3536). Commissioner Hamman stated that we "do need

places like this. In every community. They need to be in compatible

neighborhoods[.]" (JX80:3537).

Another subtle but important distinction. Plaintiffs do not demonstrate

that the commissioners adopted or ratified discriminatory remarks opposing

their application merely by denying the application. *See Schwarz v. City of

Treasure Island*, 544 F.3d 1201, 1216 (11th Cir. 2008) ("evidence that

neighbors and city officials are biased against recovering substance abusers

is irrelevant absent some indication that the recoverers were treated

differently than non-recoverers"). Plaintiffs have not identified evidence that

the County treated recoverers differently than non-recoverers. Plaintiffs'

planner, Martin, admitted that none of the commissioners made any

discriminatory remarks or comments. (Tr. 579:9–11). Instead, Plaintiffs

merely speculate that the Board discriminated. This does not pass muster.

Fourth, the evidence does not demonstrate that the Board deviated

from its normal procedure or substantive criteria in rendering its decision.

Commissioner Hamman asked and the county attorney confirmed that the

Board was not doing anything procedurally different in this hearing than in

other zoning hearings. (Tr. 212:7; 213:14–17; JX80: 003459–60). Plaintiffs

criticize Commissioners Kiker and Manning for announcing they would

86

produce substantial evidence adverse to the application before they heard evidence, and Commissioner Manning for advising KR's lawyer that he would give his reasons for opposing the application after KR concluded its presentation, depriving KR of the opportunity to respond. (Doc. 223 at 87). But they do not explain how this constitutes a deviation from the Board's normal procedures. Commissioner Pendergrass specifically said at the beginning of the hearing, "We'll hear the comments today." (JX80:3444).

The County has an ordinance prohibiting ex parte communications with the commissioners regarding the substance of a pending rezoning action or appeal that the Board will consider. (Tr. 176:18–177:19, 672:5–8). Seemingly to support their argument that normal procedures were not followed, Plaintiffs note that none of the commissioners disclosed or were called on to disclose any ex parte communications before the Board hearing. (Doc. 223 at 28 (citing PTS-2, p. 3, PX 23; PTS-4, p. 9; JX 80)). But Plaintiffs do not further develop the point. They do not identify evidence in the record of any violation of the ordinance. (Tr. 177:20–24, 672:9–21). To the extent that Plaintiffs also assert that the commissioners did not ask about campaign contribution or ex parte communications, they do not identify evidence that the commissioners asked about those items in other hearings. Any argument about purported ex parte communications as circumstantial evidence of discrimination is a nonstarter.

The Court rejects the argument that the Board's denial of the application despite the staff and hearing examiner's recommendations of approval, combined with the public's opposition, deviates from customary procedures and thus circumstantial evidence of discrimination. (Doc. 223 at 85). The Eleventh Circuit has rejected a similar argument, reasoning that "such procedural abnormalities are only relevant within a larger scope." *Hallmark*, 466 F.3d at 1285 (cleaned up and citation omitted). As the County points out, Ekblad explained that the Board cannot approve a rezoning request that does not comply with Policy 5.1.5. (Tr. 210:1–20). What's more, the Board makes the final decision on zoning requests; it is not bound by staff or the hearing examiner. They merely make recommendations to the Board. But the Board decides. That is the process. (JX1).

And Palermo testified that there have been other zoning cases where the Board disagreed with the staff or the hearing examiner. (Tr. 212:25–213:5). He testified "[t]hat's just difference, nothing bad or impolitic about that." (Tr. 213:4–5). There is no dispute that Policy 5.1.5 was in effect before Plaintiffs' application. The Board did not implement it, or any other changes to the Lee Plan, to thwart Plaintiffs' application. *Contra Caron*, 879 F. Supp. 2d at 1369–70 ("While amendments were being considered, there was vocal community and planning board opposition to rehabilitation facilities in single family areas. The City modified its transient use ordinance. The City denied

88

Caron's reasonable accommodation request the next day.  This sequence is highly suspect and strongly suggests that the City acted with an improper discriminatory motive.").  In sum, the Court finds no indication that the County deviated from its normal procedural or substantive criteria in denying the application.

"[A] disparate treatment claim requires a plaintiff to show that he has actually been treated differently than similarly situated non-handicapped people." *Schwarz*, 544 F.3d at 1216; *see also Loren v. Sasser*, 309 F.3d 1296, 1302 (11th Cir. 2002).  Plaintiffs have failed to show by a preponderance of the evidence that the County treated them differently than any non-disabled applicants.

They also failed to identify any non-disabled similarly situated comparator who the Board treated differently.  To be similarly situated, the plaintiff and the person it identifies as a comparator must be similarly situated in all relevant respects.  *Lewis v. City of Union City, Ga.*, 918 F.3d 1213, 1229 (11th Cir. 2019) (en banc).

Plaintiffs point to other substance abuse treatment facilities, but none of those facilities are located in unincorporated Lee County.  (Tr. 105:18–20, 106:14–17, 302:7–13, 335:15–16, 498:7–8, 559:24–560:3).  While Plaintiffs pointed to Park Royal Hospital, that facility was not licensed by DCF. (DX93).  Plaintiffs also failed to establish what its zoning is, which LDC

89

applied to it, which Board made the decision, and that it sought to rezone property with a current single-family residential use. (Tr. 107:15–16).

Plaintiffs also point to the church as a comparator because it operates a school. Notably, in Martin's summaries of the surrounding area and uses, she did not identify the school. Moreover, Plaintiffs fail to provide evidence that these uses were not permitted as of right in the AG-2 zoning district. While Plaintiffs seek an injunction permitting 26 uses that are prohibited in AG-2 zoning, they failed to show that the church was similarly situated. (Tr. 451:17–452:8; 505:6–8, 641:11–14, 641:15–642:1).

Plaintiffs also point to an assisted living facility on College Parkway. But an assisted living facility is only one of 26 uses that Plaintiffs seek to impose by injunction. (JX66 at Ex. B). It also applied for and was granted zoning to RPD, which Plaintiffs did not seek.

Martin also suggested that the senior living facility use at St. John's Villas is comparable. But Martin admitted that she was not involved in the rezoning process from AG-2 to CFPD and had no knowledge about that process or decision. (Tr. 615:3-6). She was only involved in the addition of a use to the schedule of uses in 2010. (Tr. 616:16–19, JX51). Plaintiffs did not show that either decision involved the same decision-makers. (Tr. 617:8–12). This property also involved a different planning community, different future land use category, a different density, and no commercial uses. (Tr. 617:13–

25).  The Court does not find St. John's Villas to be a proper comparator.

Given these factors, the Court finds that Plaintiffs fail to establish a prima facie case of intentional discrimination.  And even assuming, arguendo, that Plaintiffs established a prima facie case, they nevertheless failed to establish that the proffered reason for the Board's denial of the application—that it was inconsistent with Policy 5.1.5—was pretextual.

Plaintiffs' effort to establish pretext amounts to no more than conjecture.  But Plaintiffs' subjective belief is not enough to establish a claim of discrimination.  *See Monds v. Quitman*, 767 F. App'x 750, 756–57 (11th Cir. 2019) (unsupported subjective belief does not raise a genuine issue of material fact from which a reasonable jury could infer pretext and discrimination).  Plaintiffs' proposed FFCL do not clearly set forth the evidence showing that the Board's reason was false and that discrimination was the real reason for the denial.  "Judges are not like pigs, hunting for truffles buried in briefs." *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991).  Rather than delineating their pretext argument, Plaintiffs leave the Court to guess what in the record they believe supports their pretext argument and why.  As another district judge from this Circuit aptly observed:

> The Court is under no obligation to do the work of manufacturing a claim for judicial review for plaintiff. After all, "judges are not archaeologists.  They need not

> excavate masses of papers in search of revealing tidbits —
> not only because the rules of procedure place the burden
> on the litigants, but also because their time is scarce."
> *Nw. Nat'l Ins. Co. v. Baltes*, 15 F.3d 660, 662–63 (7th Cir.
> 1994). They need not endeavor to "fish a gold coin from a
> bucket of mud." *U.S. ex rel. Garst v. Lockheed-Martin
> Corp.*, 328 F.3d 374, 378 (7th Cir. 2003).

*Lowrance v. Berryhill*, No. 4:18-CV-89, 2019 WL 1085187, at *1 (S.D. Ga.

Mar. 7, 2019).

To the extent that any of the evidence the Court analyzed above could

be construed as a pretext argument, the Court finds such an argument

without merit for the reasons already described. This leaves only a sliver of

an argument. In a (seemingly unrelated) section of Plaintiffs' proposed FFCL

concerning their contention that their claims are not barred by the Tenth

Amendment, they quarrel with Hanson's comment at the hearing that

"perception is reality in real estate." (Doc. 223 at 84 (citing JX 48 (HEX Tr.

329:2–4)). In a footnote, Plaintiffs describe the comment as "impermissible

pretext for discrimination." (Doc. 223 at 84 n.40). They do not elaborate on

why the comment is impermissible in the first instance or why it is pretext

for discrimination. The Court will not do this work for them.[16]

---

[16] The Court read the Honorable Elizabeth V. Krier's Order Denying Petition for
Writ of Certiorari. (Doc. 20-2). Although Judge Krier analyzed Hanson's testimony under
the rubric of competent and substantial evidence, rather than the standards governing this
case, her analysis is nonetheless instructive. She observed that Hanson's testimony before
the hearing examiner concerned the impact of crime, while the testimony offered at the

"A plaintiff may show pretext either by directly persuading the court a discriminatory reason motivated the defendant, or by indirectly showing the [defendant's] proffered explanation is unworthy of credence." *Johnson v. Switch & Data Mgmt. Co. LLC*, 199 F. App'x 834, 835 (11th Cir. 2006). In considering whether the plaintiff has established pretext, "[a] court's purpose is not to determine whether the [defendant's] decision was prudent or fair, but is to determine whether an unlawful discriminatory animus motivated the employment decision." *Id.* "Stated differently, pretext is not present 'unless it is shown both that the reason was false, and that discrimination was the real reason.'" *Id.* (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993)).

Here, the evidence established that the Board was persuaded that Plaintiffs' zoning application was inconsistent with Policy 5.1.5. Its proposed uses were intense, commercial, and were not compatible with the Winkler Property's AG-2 zoning. A mountain of speculation does not amount to intentional discrimination. The Court finds no reason to suspect that discriminatory animus informed or motivated the Board's decision to deny

---

Board hearing did not. (*Id.* at 13). The Court will not reiterate her analysis in full but notes that the undersigned agrees with her finding that "it does not appear that it was error for the Board to rely on Mr. Hanson's testimony." (*Id.*).

the rezoning application.  As a result, the County is entitled to judgment in its favor on Plaintiffs' intentional discrimination claim.

### Failure to Accommodate

To prevail on a failure to accommodate claim, a plaintiff must prove that (1) he is disabled, (2) he asked for a reasonable accommodation, (3) the requested accommodation was necessary to allow him to equally use and enjoy a dwelling, and (4) the defendant refused to make the requested accommodation.[17]  *Schaw v. Habitat for Human. of Citrus Cnty., Inc.*, 938 F.3d 1259, 1264 (11th Cir. 2019).

### *Disabled*

The County raised the argument at the summary judgment stage of this case that Plaintiffs have not proven that they are disabled (or associated with those who are disabled) under the ADA.  (Doc. 158 at 31–33).  The Court rejected this argument.  (Doc. 183 at 13–14).  In its proposed FFCL, the County again argues that Plaintiffs are not disabled, and Title II of the ADA does not recognize a claim of associational discrimination.  (Doc. 224 at 84–87).  The Court maintains its ruling and declines to reiterate it here.  Accordingly, the Court finds that Plaintiffs have shown that they intended to

---

[17] It is undisputed that the County refused to make the requested accommodation, so the Court addresses this element no further.

associate with disabled individuals and thus satisfy the first element.

*Request for a Reasonable Accommodation*

In their June 10, 2016, letter to David Loveland, Director of Community Development in Lee County, Plaintiffs explained that they "want to open a new residential substance abuse treatment facility with 72 residents and necessary staff in the AG-2 zone, on a separate parcel near its existing facility." (JX85:579). Specifically, they requested that the County "grant a reasonable accommodation administratively to treat the proposed use as a permitted use or, in the alternative, to rezone the property to Commercial Facilities Planned Development (CFPD) and treat the proposed use as a permitted one." (JX85:579). The proposed use was to redevelop the existing 5.15 acre parcel and existing buildings (consisting of a guest house structure without a certificate of occupancy and a 17,000 square foot shell structure on the County's abandoned property list) to a holistic medicine center to provide social and health related services including the treatment of alcoholism, substance abuse, and addiction issues. The holistic medicine center would include a residential treatment component, with a maximum of 90 beds[18], and would utilize a central kitchen, nine additional dwelling units (with individual kitchens), 9,000 square feet of accessory medical office and

---

[18] Plaintiffs now request 72 beds.

accessory retail/food uses (limited to the facility), a place of worship, religious facilities, and private recreational facilities. (Doc. 223 at 14–15; JX66 at 1, 32; JX88:537).

The duty to accommodate "is not triggered unless a specific demand for an accommodation has been made." *Gaston v. Bellingrath Gardens & Home, Inc.*, 167 F.3d 1361, 1363 (11th Cir. 1999). Generally, "it is the responsibility of the individual with a disability to inform [defendant] that an accommodation is needed." *Id.* at 1364 (citation omitted). So Plaintiffs bear the initial burden to show they made a request. *Frazier-White v. Gee*, 818 F.3d 1249, 1255–56 (11th Cir. 2016).

There is not a precise "form the request for a reasonable accommodation must take." *Hunt v. Aimco Props., L.P.*, 814 F.3d 1213, 1226 (11th Cir. 2016) (cleaned up). Neither "formalisms" nor "magic words" are dispositive. *Id.* (citations omitted). But a plaintiff must make a request (in one form or another) that gives a defendant "enough information to know of both the disability and desire for an accommodation." *Id.* Put another way, the "circumstances must at least be sufficient to cause a reasonable [defendant] to make appropriate inquiries about the possible need for an accommodation." *Id.*

"The ADA does not expect telepathy though." *Rood v. Town of Ft. Myers Beach, Fla.*, 622 F. Supp. 3d 1217, 1228 (M.D. Fla. 2022). A defendant

"cannot be liable for refusing to grant a reasonable and necessary accommodation if [it] never knew the accommodation was in fact necessary." *Schwarz*, 544 F.3d at 1219 (citation omitted) ("Simply put, a plaintiff must actually request an accommodation."). That said, willful ignorance is no defense. If a defendant "is skeptical about an alleged disability or its ability to provide an accommodation," it must "'request documentation or open a dialogue' in what is known in the ADA-context as the 'interactive process.'" *Bone v. Vill. Club, Inc.*, 223 F. Supp. 3d 1203, 1213 (M.D. Fla. 2016) (quoting *United States v. Hialeah Hous. Auth.*, 418 F. App'x 872, 877 (11th Cir. 2011)).

"Several courts have held that if there is a local procedure (such as a variance process) through which the plaintiffs can obtain the accommodations they want, they must use that procedure first and come away unsatisfied prior to filing suit in federal court." *Schwarz*, 544 F.3d at 1219 n.11 (citing *Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 577 (2d Cir. 2003) ("To prevail on a reasonable accommodation claim, plaintiffs must first provide the governmental entity an opportunity to accommodate them through the entity's established procedures used to adjust the neutral policy in question.")).

The County argues that Plaintiffs did not request an accommodation.[19] (Doc. 224 at 96–98). They assert that the proper process to obtain rezoning is an application to the Board. (*Id.*). But they argue that Plaintiffs did not use that process. KR did not exist when the application was filed, neither Plaintiff was a party to the contract for the sale of the Winkler Property, DTC was not authorized to file a rezoning application, and T. Mouracade was not a member of DTC or authorized to act for it. Plaintiffs do not address this argument in their proposed FFCL. Instead, they assume they properly requested an accommodation. (*See* Doc. 223).

The Court might find the County's argument more persuasive had it been raised in response to the June 2016 letter requesting an accommodation. But Mark A. Trank, Assistant County Attorney, responded to the letter on the merits. (JX86). He did not reject the letter as an improper request for accommodation. Because the County proceeded as if the letter constituted a request for accommodation in August 2016, the Court does as well. The Court concludes Plaintiffs requested an accommodation.

---

[19] It appears that this is the first time the County has argued that no request was made. (*See* Doc. 158 (motion for summary judgment)). At the summary judgment stage, the Court observed that it "need only look at the second and third elements [(2) he asked for a reasonable accommodation, (3) the requested accommodation was necessary to allow him to equally use and enjoy a dwelling] to find genuine issues of material fact[.]" (Doc. 183 at 16).

*Necessary*

"To succeed on a failure-to-accommodate claim, a plaintiff must demonstrate that its requested accommodation is 'necessary.'" *Sailboat Bend*, 479 F. Supp. 3d at 1298 (quoting 42 U.S.C. § 12182(b)(2)(A) (ADA Title III); 42 U.S.C. § 3604(f)(3)(B) (FHAA)); *see also* 28 C.F.R. § 35.130(b)(7)(i) (ADA Title II). That term carries its plain meaning of "indispensable, requisite, essential . . . or absolutely required." *Vorchheimer v. Philadelphian Owners Ass'n*, 903 F.3d 100, 105–07 (3d Cir. 2018).

So "a necessary accommodation is one that alleviates the effects of a disability." *Bhogaita v. Altamonte Heights Condo. Ass'n, Inc.*, 765 F.3d 1277, 1288 (11th Cir. 2014) (internal quotation marks omitted). For necessity, the accommodation must "address the needs created by the" disability. *Schwarz*, 544 F.3d at 1226. (emphasis omitted). When "accommodations go beyond addressing these needs and start addressing problems not caused by a person's handicap, then the handicapped person would receive not an 'equal,' but rather a better opportunity to use and enjoy a dwelling."[20] *Id.* The statutory and regulatory plain language "cannot support" that result. *Id.*

---

[20] The Eleventh Circuit explains that "the ADA and the RA may be broader than the FHA because . . . coverage under the FHA is limited to statutorily defined 'dwellings,' but that term appears nowhere in the relevant provisions of the ADA and the RA." *Schwarz*, 544 F.3d at 1212 (citing 42 U.S.C. § 12132). Plaintiffs concede that "generally, the same principles govern interpretation of the ADA and FHAA" and state that the "Kimberly Center is clearly a 'dwelling.'" (Doc. 223 at 56 n.27).

In its summary judgment order, the Court explained that

> to be necessary, Plaintiffs must show that living in the
> therapy center with the requested features (like a place of
> worship, communal dining, and medical/health features)
> all address a need caused by their residents' addiction.
> *See Schwarz v. City of Treasure Island*, 544 F.3d 1201,
> 1225 (11th Cir. 2008). Plaintiffs intend to call an expert
> to testify about the need for a treatment facility in the
> local community, but it is unclear whether they have
> evidence about the need for the proposed facility's
> particular features. Because this matter is better
> resolved at the bench trial, the Court denies summary
> judgment as to the failure to accommodate claim.

(Doc. 183 at 17). In other words, the proper necessity question here is
whether the accommodation sought (rezoning to permit a 72-bed facility with
26 proposed uses) is necessary (1) to alleviate the effects of the disability and
(2) for the disabled person to have equal enjoyment of the property. For the
reasons below, Plaintiffs have failed to establish by a preponderance of the
evidence that the requested accommodation was necessary.

At trial, Plaintiffs introduced evidence of necessity primarily through
M. Mouracade and peripherally through Martin. The Court addresses
Martin's testimony first. Martin testified about the need for treatment in the
context of helping a friend recovering from a substance use disorder. She
testified that they tried to get him into SalusCare in Lee County multiple
times, but no beds were available. (Tr. 566:14–567:2). They were turned
away from David Lawrence at first, but that facility later admitted her
friend. The Court affords Martin's anecdotal testimony the smallest weight

possible.    As explained above, her personal relationship with Plaintiffs
undermines her credibility in the Court's eyes.  Moreover, Martin's planning
expertise does not qualify her to render an expert opinion on the need for the
accommodation here.  Her testimony shows one isolated example and does
not    aid    the    Court    in    determining    whether    Plaintiffs'    requested
accommodation was necessary under the ADA.

Next, the Court examines M. Mouracade's testimony.  M. Mouracade's
deep personal, professional, and financial relationships to Plaintiffs utterly
undermine her credibility.  The Court has also found that her expertise in
treating patients regarding internal medicine and addiction medicine does
not render her qualified to give an expert opinion on the need for a facility
with as many beds and auxiliary uses as Plaintiffs request here.  So Plaintiffs
failed  to  meet  their  burden  of  proof  on  the  necessary  element  of  their
accommodation claim.  But even if the Court set aside these gaping holes in
Plaintiffs' case, M. Mouracade's testimony still does not establish that the
requested accommodation is necessary.

The County makes an important threshold point.  (Doc. 224 at 99).  The
necessity  requirement  asks  whether  the  accommodation  is  necessary  to
alleviate the disability and provide equal use and enjoyment of the property.
The need for treatment in Lee County is not relevant to this determination.
*Schwarz*,  544  F.3d  at  1225  ("reasonable  accommodation  analysis  asks

whether a handicapped person must be accommodated in the dwelling of his choice, rather than at another location in the municipality"). But even if it were relevant, the evidence Plaintiffs presented fails to establish the need.

Through M. Mouracade, Plaintiffs presented evidence on the prevalence of substance use in Florida and individuals seeking treatment. (Tr. 294:18–294:14; PX 31; PX 32). She testified that the data in these studies is "macro data for the State of Florida." (Tr. 284:22–25; Tr. 327:7–11; PX 31; PX 32). The data is over 10 years old—only as late as 2014.[21] (Tr. 294:1–9). And Mr. Burt said at the hearing examiner's hearing that T. Mouracade said he expected 80 to 90 percent of KR's patients to be from out of town.[22] (JX 48:001228). Plaintiffs did not present evidence explaining why this data is relevant to determining whether their proposed accommodation in Lee County on Winkler Road is necessary. The Court does not find a statewide data set relevant to determining whether administratively treating the proposed use for KR as a permitted use, or rezoning the Winkler Property

---

[21] The Court reasonably infers that Plaintiffs presented stale data because it was the data that arguably would have been relevant at the time of the Board's decision in 2015. But to the extent that Plaintiffs ask the Court to craft an injunction in 2025, the ten-year old data they present would be of little help to the Court in doing so. The point is moot, as the Court finds Plaintiffs are not entitled to injunctive relief.

[22] On cross-examination, T. Mouracade stated that he meant that "a treatment facility may have up to 85 or 90 percent people from out of town, and that . . . is not the population that we are looking to serve." (Tr. 729:23–730:9). For the reasons previously explained, the Court finds that T. Mouracade's testimony lacks credibility.

from AG-2 to CFPD, is a necessary accommodation.

Another data set Plaintiffs presented concerned Florida's Twentieth Judicial Circuit, which includes Lee County.   (PX 55).   That said, the Twentieth Judicial Circuit includes Lee, Charlotte, Collier, Glades, and Hendry Counties, and the data does not break down county by county.  (Tr. 327:12–328:4).  Plaintiffs did not present evidence explaining why this data set is relevant to determining whether their proposed accommodation in Lee County on Winkler Road is necessary.    The Court finds this study unpersuasive.

M. Mouracade also testified that the data in the studies "lumped together" the need for outpatient and inpatient services. (Tr. 293:17–25).  At least one of the studies she relied on contained data about addicts who did not receive treatment—importantly, it did not distinguish between people seeking treatment versus those not seeking treatment.  (Tr. 296:18—298:25; PX 32).  Given KR would not take court-ordered patients (Tr. 297:24–298:10), the combined data in the study is not relevant here because it does not break out patients seeking treatment who did not receive it.  The Court does not find such unspecific data helpful in determining whether rezoning the Winkler Property to permit the operation of a 72-bed facility like KR was a necessary accommodation.  Even if such data was relevant, M. Mouracade did not convince the Court that the data establishes a need for the proposed

accommodation.

M. Mouracade also testified that she solicited physicians in Lee County to provide 25 letters of support attesting to the need for this facility in Lee County. (Tr. 250:4–14). That said, she explained that only one of them is "addiction boarded." (Tr. 295:2–5). Further, the doctors' statements about the need for this type of residential treatment in Lee County came from their general experience. It was not based on a "data-driven basis for the need for inpatient residential treatment in Lee County." (Tr. 295:6–296:1). Because the letters were solicited by Plaintiffs, were not from doctors specializing in addiction medicine (save one), and were not based on studies or data, the Court finds that they have little to no weight in determining whether Plaintiffs met their burden on the necessity element.

Another critical point. The Court wrote in its summary judgment order that "Plaintiffs must show that living in the therapy center with the requested features (like a place of worship, communal dining, and medical/health features) all address a need caused by their residents' addiction." (Doc. 183 at 17). They have not done so. They have not established why they request 72 beds, rather than another number of beds.[23]

---

[23] The Court understands the hearing examiner recommended 72 beds, which is the basis for Plaintiffs' request. But the Court finds that Plaintiffs did not establish at trial

They have not shown how the number of beds relates to their disability and use of the property. *Cf. Vision Warriors Church, Inc. v. Cherokee Cnty. Bd. of Comm'rs*, No. 22-10773, 2024 WL 125969, at *11 (11th Cir. Jan. 11, 2024) (requested accommodation was not necessary under the FHA and ADA where Vision Warriors did not explain why the requested 55 members were therapeutically more meaningful as opposed to the eight members it was legally permitted to house at any time); *Caron*, 879 F. Supp. 2d at 1365 (finding plaintiff failed to demonstrate requested accommodation of seven residents, as opposed to only four or five, was necessary).

Similarly, they have not established that having a retail space will alleviate the effects of their disability. They have not established that having a medical office building and a medical director's office will alleviate the effects of a disability. They have not established that having administrative offices will alleviate the effects of a disability. They have not established that residing in a building that is 45 feet tall will alleviate the effects of a disability. They have not established that having 15,000 square feet of commercial development will alleviate the effects of a substance abuse disorder, and they have not established that having more than 61,537 square

---

why that number was necessary to alleviate a disability or allow for equal enjoyment of the property.

feet of development will alleviate the effects of a disability. Yet those intense, commercial uses and more are what Plaintiffs seek in this lawsuit.

The Court also finds that Plaintiffs have not shown by a preponderance of the evidence that the requested accommodation is necessary for equal enjoyment of the property. Plaintiffs admit that individuals in recovery have resided at the property. (Tr. 246:6–10; 597:7–598:4). These individuals had the same use of the property as other residents of Cold Saturday Farms. The County has not permitted commercial use of the Winkler Property, nor have any other commercial establishments of similar intensity and use been permitted on the other Cold Saturday Farms parcels. There is no mixed use on Winkler Road between College Parkway and Cypress Lake Drive. Plaintiffs have not shown that the County has relaxed its zoning scheme in the past or that it waives its zoning scheme upon request. Indeed, Plaintiffs admit that the County made it clear that they would not approve any commercial use of the property.

The Court finds that Plaintiffs failed to demonstrate by a preponderance of the evidence that it is necessary to operate a 72-bed facility, with 9 additional dwelling units and 9,000 square feet of accessory medical office and accessory retail/food uses, to alleviate the effects of a disability. (JX88:000537, 000540). Instead, they seek preferential treatment—to allow commercial uses to encroach on an existing residential area, which the

106

County has not permitted for other commercial establishments. As the Eleventh Circuit explained, "[i]f accommodations go beyond addressing these needs and start addressing problems not caused by a person's handicap, then the handicapped person would receive not an 'equal,' but rather a better opportunity to use and enjoy a dwelling, a preference that the plain language of this statute cannot support." *Schwarz*, 544 F.3d at 1226. Such is the case here. Thus, Plaintiffs have not shown by a preponderance of the evidence that the requested accommodation is necessary.

The elements of the claim are conjunctive. Therefore, because the Court finds the requested accommodation is not necessary under the ADA, the Court need not analyze whether it is reasonable. In any event, the Court also explains why Plaintiffs' requested accommodation is not reasonable.

### *Reasonable*

If a plaintiff's request is facially reasonable,[24] the burden shifts to the defendant, who must prove that the accommodation would nonetheless impose an "undue burden" or result in a "fundamental alteration" of its

---

[24] The Court ruled in its summary judgment order that Plaintiffs' request was at least facially reasonable because the hearing examiner and other staff recommended approving Plaintiffs' application. (Doc. 183 at 16). For consistency's sake, the Court assumes without deciding that Plaintiffs showed at trial that their request was facially reasonable.

program.[25]  *Schaw*, 938 F.3d at 1266 (quoting *Schwarz*, 544 F.3d at 1220).

"An accommodation requires a fundamental alteration if it would eliminate

an essential aspect of the relevant activity."  *Id.* (cleaned up).  Whether a

particular aspect of an activity is "essential" will turn on the facts of each

case.  *Id.* (quoting *Schwarz*, 544 F.3d at 1221).

The basic purpose of zoning is to bring complementary land uses

together, while separating incompatible ones."  *Schwarz*, 544 F.3d at 1221.

As a result, "ordering a municipality to waive a zoning rule ordinarily would

cause a fundamental alteration of its zoning scheme if the proposed use was

incompatible with surrounding land uses."  *Id*. (cleaned up; citation omitted).

The County denied Plaintiffs' accommodation request because to do

otherwise would violate Policy 5.1.5.  (Doc. 157-5).  The Board determined

that the proposed rezoning would result in the encroachment of commercial

uses into an existing residential area; is incompatible with and not an

acceptable transition into the low-density residential area to the south; and is

not consistent with the surrounding land uses.  (*Id.* at 7).  The Board

determined that Policy 5.1.5 was essential to the County's zoning scheme.

(*Id.*).  Martin testified that KR and DTC agree that Policy 5.1.5 is essential to

---

[25] The County does not argue the requested accommodation imposes undue financial
and administrative burdens, so the Court does not address this issue.  (Doc. 224 at 101).

the County zoning scheme. (Tr. 572:6–10). Policy 5.1.5 brings together complementary residential uses and separates incompatible commercial ones.

The evidence shows that Plaintiffs' multiple proposed uses of the Winkler Property are intense and commercial. In fact, the first phase of the development was only commercial. There was no requirement under the hearing examiner's recommendation that the property would be developed beyond the first phase. The proposed commercial uses, such as a large parking lot, a building ten feet taller than the requested zoning scheme would allow, a coffee shop, a spa, among others, are incompatible with the residential community.

Granting the rezoning request would have resulted in the encroachment of commercial uses in the existing residential area in violation of Policy 5.1.5. The Court agrees with the County that "[t]he Lee Plan Rule barring development in a manner that is potentially destructive to the character and integrity of existing and future residential areas is essential to the County's zoning scheme." (Doc. 157-5 at 8). It would be unreasonable to require the Board to ignore this policy.

Plaintiffs did not show that the County has relaxed its stance on Policy 5.1.5 in the past, let alone that it "routinely waives [it] upon request." *See Palm Partners*, 102 F. Supp. 3d at 1221. This history bolsters the Court's conclusion that Policy 5.1.5 is essential to the County's zoning scheme.

Requiring the County to waive it and accommodate Plaintiffs' proposed substance abuse treatment facility, with its 26 additional uses, would amount to a fundamental alteration of the County's zoning scheme. Accordingly, it is not a reasonable request. The County is therefore entitled to judgment in its favor on Plaintiffs' failure to accommodate claim.

### Requested Relief

Because the Court has concluded that Plaintiffs failed to prove the County violated the ADA, it need not address the County's arguments about whether injunctive or declaratory relief can or should be granted.

### Rule 52

The County moved for judgment on partial findings under Federal Rule of Civil Procedure 52(c) at the end of Plaintiffs' case in chief. (Doc. 215 at 213). The Court reserved ruling on that motion. (Doc. 215 at 216). Because the Court now issues its Findings of Facts and Conclusions of Law under Rule 52(a), the County's Rule 52(c) motion is denied as moot.

### <u>CONCLUSION</u>

Plaintiffs failed to establish that the County discriminated against disabled individuals and failed to accommodate their reasonable request.

Accordingly, it is now

**ORDERED:**

1.    Defendant Lee County is entitled to judgment in its favor under

Federal Rule of Civil Procedure 58 on the Complaint (Doc. 1).

2.      Defendant Lee County's Federal Rule of Civil Procedure 52(c)

motion is **DENIED as moot**.

3.      The Clerk is **DIRECTED** to enter judgment, terminate any

pending deadlines, and close the case.

**DONE** and **ORDERED** in Fort Myers, Florida on July 14, 2025.

SHERI POLSTER CHAPPELL
UNITED STATES DISTRICT JUDGE

Copies:  All Parties of Record

111